Jane **DOE,** on behalf of herself and as guardian ad litem for her minor children, John Doe; Mary Doe; Sally Doe; and Robert Doe, Plaintiffs,

v.

**BOROUGH OF BARRINGTON;** Thomas Page, individually and as Chief of Police of the Borough of Barrington; George Breene, individually and as Detective of Barrington Police Department; Borough of Runnemede; Russell Smith, individually and as Patrolman of Runnemede Police Department; Rita DiAngelo, individually and as school employee of the Borough of Runnemede, Defendants.

Civ. A. No. 88–2642 (SSB).

United States District Court, D. New Jersey.

Jan. 29, 1990.

Tomar, Seliger, Simonoff, Adourian & O'Brien by Theodore M. Lieverman and James Katz, Haddonfield, N.J., for plaintiffs.

Maloney & McCafferty by Michael P. McCafferty, Marlton, N.J., for defendants Borough of Runnemede and Officer Russell Smith.

Montano, Summers, Mullen, Manual & Owens by F. Herbert Owens, III, Westmont, N.J., for defendants Borough of Barrington, Chief of Police Page and Detective Breene.

Robert L. Messick, Haddonfield, N.J., for defendant Rita DiAngelo.

BROTMAN, District Judge.

Presently before the court is the motion of plaintiffs Jane Doe and her children [1] for partial summary judgment against defendants Borough of Runnemede ("Runnemede") and Officer Smith. These defendants have cross-moved for summary judgment. This case presents novel issues concerning the privacy rights of individuals who have contracted Acquired Immune Deficiency Syndrome ("AIDS") and the privacy rights of their family members. For the reasons stated in this opinion, plaintiffs' motion for summary judgment against defendants Runnemede and Smith will be granted. Accordingly, the motion of defendants Runnemede and Smith for summary judgment will be denied.

## I. FACTS AND PROCEDURE

The facts are largely undisputed. On March 25, 1987, Jane Doe, her husband, and their friend James Tarvis were traveling in the Doe's pickup truck through the Borough of Barrington ("Barrington"). At approximately 9:00 a.m., a Barrington police officer stopped the truck and questioned the occupants. As a result of the vehicle stop, Barrington officers arrested Jane Doe's husband and impounded the pickup truck. Barrington officers escorted Jane Doe, her husband, and James Tarvis to the Barrington Police Station.

When he was initially arrested, Jane Doe's husband told the police officers that he had tested HIV positive and that the officers should be careful in searching him because he had "weeping lesions." There is some dispute over the exact words used by Jane Doe's husband and about the number of persons present when Jane Doe's husband revealed the information. These disputed facts do not change the outcome here. Barrington police released Jane Doe and James Tarvis from custody, but detained Jane Doe's husband on charges of unlawful possession of a hypodermic needle and a burglary detainer entered by Essex County.

Sometime in the late afternoon of the same day, Jane Doe and James Tarvis drove Tarvis's car to the Doe residence in the Borough of Runnemede ("Runnemede"). The car engine was left running, and the car apparently slipped into gear, rolling down the driveway into a neighbor's fence. The neighbors owning the fence are Michael DiAngelo and defendant Rita DiAngelo. Rita DiAngelo is an employee in the school district in Runnemede.

Two Runnemede police officers, Steven Van Camp and defendant Russell Smith, responded to the radio call about the incident. While they were at the scene, Detective Preen of the Barrington police arrived and, in a private conversation with Van Camp, revealed that Jane Doe's husband had been arrested earlier in the day and had told Barrington police officers that he had AIDS. Van Camp then told defendant Smith.

After Jane Doe and Tarvis left the immediate vicinity, defendant Smith told the DiAngelos that Jane Doe's husband had AIDS and that, to protect herself, Rita DiAngelo should wash with disinfectant. There is some dispute about Smith's exact words to the DiAngelos,[2] however this dis-

1. On July 6, 1988, this court entered a protective order permitting the plaintiffs to proceed using fictitious names.

2. Plaintiff's initial brief and defendant's brief both allege that Smith said that Jane Doe's husband "is a confirmed AIDS carrier and that

pute does not change the outcome here. Defendant Rita DiAngelo became upset upon hearing this information. Knowing that the four Doe children attended the Downing School in Runnemede, the school that her own daughter attended, DiAngelo contacted other parents with children in the school. She also contacted the media. The next day, eleven parents removed nineteen children from the Downing School due to a panic over the Doe children's attending the school. The media was present, and the story was covered in the local newspapers and on television. At least one of the reports mentioned the name of the Doe family. Plaintiffs allege that as a result of the disclosure, they have suffered harassment, discrimination, and humiliation. They allege they have been shunned by the community.

Plaintiffs brought this civil rights action against the police officer Smith and the municipalities of Barrington and Runnemede for violations of their federal constitutional rights pursuant to 42 U.S.C. § 1983 (1982). The federal constitutional right is their right to privacy under the fourteenth amendment. The suit contains pendent state claims against defendant DiAngelo for invasion of privacy and intentional infliction of emotional distress. The plaintiffs' motion for summary judgment seeks judgment against only defendants Runnemede and Smith; these defendants filed a cross-motion for summary judgment with their response to plaintiffs' motion.

Plaintiffs maintain that the fourteenth amendment protects them from the government's disclosure of plaintiff Jane Doe's husband's infection with the AIDS virus. Plaintiffs assert that Officer Smith and the Borough of Runnemede are liable under 42 U.S.C. § 1983 (1982) for this violation of their constitutional rights.

Defendants Runnemede and Smith respond by stating:

1. plaintiffs have no standing because only Jane Doe's husband's privacy was invaded, and he is not party to this suit;[3]
2. Smith's action was not misconduct, and thus no action can be maintained under section 1983;
3. Jane Doe's husband "published" the information and, therefore, gave up any right to privacy in this information;
4. cases cited by plaintiff are all distinguishable on their facts;
5. there are no conclusive facts about AIDS, thus Smith's warning that DiAngelo might have been exposed through casual contact with Jane Doe was justified; and
6. Runnemede's failure to have an nondisclosure policy for arrestees is not actionable because no other municipality or state agency has a policy in place.

## II. DISCUSSION

### A. *The Summary Judgment Standard.*

The standard for granting summary judgment is a stringent one, but it is not insurmountable. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the nonmoving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). The

[DiAngelo] should, to protect herself, wash her hands with some kind of disinfectant."

However, in a report filed the day of the incident, Smith stated that he advised the DiAngelos that "they should wash thoroughly as [Jane Doe] may have AIDS, fearing that [Jane

Doe] may have had physical contact with Mr. and Mrs. DiAngelo."

**3.** Jane Doe's husband died on September 26, 1988, after this suit had been filed.

threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Recent Supreme Court decisions mandate that "a. motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, even if the movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

### B. *Facts about AIDS.*

AIDS is a viral disease that weakens or destroys the body's immune system. The disease is caused by the presence of the Human Immunodeficiency Virus ("HIV"), which attacks the body's T-lymphocyte cells that are a critical part of the body's immune system. As a result, the body is unable to withstand infections it would normally suppress. These resulting infections, known as "opportunistic diseases," eventually cause permanent disability and death. AIDS is defined by New Jersey health regulations as the presence of both the HIV virus and one or more opportunistic diseases.[4] Thus, a person may test positive for the HIV virus[5] and yet not exhibit any signs of illness; that person is asymptomatic. Persons who exhibit effects of immunodeficiency, such as fever, weight loss, night sweats, or diarrhea, but do not have any opportunistic diseases are described as having AIDS-related Complex ("ARC"). *See* N.J.A.C. 8:57–1.14(b). AIDS has no known cure.

HIV is transmitted through contact with contaminated blood, semen, or vaginal fluids. The virus is transmitted through activities such as sexual intercourse, anal sex, use of nonsterile hypodermic needles, and transfusions of contaminated blood or blood products. Additionally, women infected with HIV can transmit the virus to their children before or during birth. Although HIV has been detected in other bodily fluids such as saliva and urine, the virus is much less concentrated, and there are no known cases of transmission of the virus by such means. The Centers for Disease Control ("CDC") terms the risk of infection from such fluids as "extremely low or nonexistent." CDC, *Update: Universal Precautions for Prevention of Transmission of Human Immunodeficiency Virus, Hepatitis B Virus, and Other Bloodborne Pathogens in Health–Care Settings*, 37 MMWR 377, 378 (June 24,

---

**4.** New Jersey health regulations define AIDS as: [A] condition affecting a person who has a reliably diagnosed disease that is at least moderately indicative of any underlying cellular immunodeficiency in the absence of an identifiable cause of cellular immunodeficiency or of increased susceptibility to that disease (including but not limited to Pneumocystis carinii pneumonia, Kaposi's sarcoma, etc.) or any current scientifically determined definition, as accepted by the State Commissioner of Health.

N.J.A.C. 8:57–1.14(a). Other opportunistic diseases include candidiasis, cryptococcosis, cryp-

tosporidiosis, cytomegalovirus disease, lymphoma of the brain, and toxoplasmosis. *See* CDC, *Revision of the CDC Surveillance Case Definition for Acquired Immune Deficiency Syndrome*, 36 MMWR No. 1S, 4S (Aug. 14, 1987).

**5.** Current tests do not actually reveal the HIV virus, but rather detect antibodies in the blood specific to the presence of the virus. CDC, *Public Health Service Guidelines for Counseling and Antibody Testing to Prevent HIV Infection and AIDS*, 36 MMWR 509 (Aug. 14, 1987).

1988); CDC, *Summary: Recommendations for Preventing Transmissions of Infection with Human T–Lymphotropic Virus Type III/Lymphadenopathy–Associated Virus in the Workplace*, 34 MMWR 681 (1985) (hereinafter *"CDC Summary"*).

In 1986, the Surgeon General announced that HIV is not transmitted through casual contact with an infected person, such as shaking hands, kissing, or contacting an object used by an infected person. United States Public Health Service, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* 13–14 (1986). *See also CDC Summary*, at 681; Friedland, Saltzman, & Rogers, *Lack of Transmission of HTLV–III/LAV Infection to Household Contacts of Patients with AIDS or AIDS–Related Complex with Oral Candidiasis*, 314 New England J.Med. 344 (Feb. 6, 1986); T. Hammett, *AIDS in Correctional Facilities: Issues and Options* 7 (1986); Curran, Morgan, Hardy, Jaffe, Darrow & Dowdle, *The Epidemiology of AIDS: Current Status and Future Prospects*, 229 Science 1352, 1356 (1985).

Later reports confirm this fact. Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic 119 (June 24, 1988); T. Hammett, *AIDS and the Law Enforcement Officer: Concerns and Policy Responses* 4–5, 17 (1987); M. Rogers, *Transmission of Human Immunodeficiency Virus Infection in the United States, Report of the Surgeon General's Workshop on Children with HIV infection and Their Families* 17 (1987); Friedland & Klein, *Transmission of the Human Immunodeficiency Virus*, 317 New England J.Med. 1124 (Oct. 29, 1987).

▪ Defendants assert that there are no conclusive facts about AIDS, therefore, a material issue of fact exists whether warning the DiAngelos was justified. Defendants cite one article to demonstrate that, although no case of AIDS has yet been

attributed to casual contact with an infected person, so much is unknown about the disease that infection through casual contact cannot be ruled out. *See* Heyward & Curran, *The Epidemiology of AIDS in the U.S.*, Scientific American 72, 80 (Oct. 1988).[6] The Surgeon General of the United States, however, has maintained since 1986 that "AIDS is *not* spread by common everyday contact but by sexual contact...." United States Department of Health and Human Services, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* 5 (1986) (emphasis in original). Defendants ignore the multitude of information, available in 1987, that flatly rejects their argument that AIDS may be spread through casual contact.

This court must take medical science as it finds it; its decision may not be based on speculation of what the state of medical science may be in the future. *Ray v. School District of DeSoto County*, 666 F.Supp. 1524, 1529 (M.D.Fla.1987). This court finds that the defendants' argument that the AIDS virus is transmitted by casual contact does not raise an issue of material fact that could "reasonably be resolved in favor of either party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). AIDS is *not* spread by casual contact and this fact was established before March 25, 1987. Other courts considering the question at the time agree. *See Thomas v. Atascadero Unified School District*, 662 F.Supp. 376, 380 (C.D.Cal.1987) (decided February 20, 1987); *District 27 Community School Board v. Board of Education*, 130 Misc.2d 398, 502 N.Y.S.2d 325 (Sup.Ct. 1986) (decided February 11, 1986).

The opponent to a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

---

**6.** In fact, the authors of the Scientific American article opined that HIV is not transmitted through casual contact. *See* Heyward & Curran, *The Epidemiology of AIDS in the U.S.*, Scientific American 72, 80 (Oct.1988). The article states that studies show the documented risk of household transmission was zero, therefore, the actual risk must be extremely low. *Id.* The authors noted that risk of transmission in other settings, such as schools and offices, is presumably even lower than in household settings. *Id.*

586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Defendants' argument that AIDS may be spread by casual contact does not meet this burden, thus, it does not bar summary judgment here.

### C. Plaintiffs' Right to Privacy.

■ The linchpin here is whether the Constitution protects plaintiffs' confidentiality with respect to Jane Doe's husband's AIDS. If the Constitution does not protect the Does from disclosure of Jane Doe's husband's condition, there is no constitutional violation to support a section 1983 claim against the officer or the municipality. There is no case directly on point. Plaintiffs assert that this privacy right was recognized in *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (Constitution protects woman's decision whether or not to terminate pregnancy); *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965) (law prohibiting use of contraceptives violates zone of privacy created by several fundamental constitutional guarantees); *Gillard v. Schmidt*, 579 F.2d 825, 829 (3d Cir.1978) (nonconsensual search of teacher's desk by school board member is violation of constitutional rights that states cause of action under section 1983).

This court finds that the Constitution protects plaintiffs from governmental disclosure of their husband's and father's infection with the AIDS virus. The United States Supreme Court has recognized that the fourteenth amendment protects two types of privacy interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (footnotes omitted). Disclosure of a family member's medical condition, especially exposure to or infection with the AIDS virus, is a disclosure of a "personal matter."

The Third Circuit recognizes a privacy right in medical records and medical information. *United States v. Westinghouse*, 638 F.2d 570, 577 (3d Cir.1980) (employee medical records clearly within zone of privacy protection). *See also In re Search Warrant (Sealed)*, 810 F.2d 67, 71 (3d Cir.), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987) (medical records clearly within constitutional sphere of right of privacy); *Trade Waste Management Ass'n, Inc. v. Hughey*, 780 F.2d 221, 234 (3d Cir.1985) (personal medical history protected from random governmental intrusion).

In *United States v. Westinghouse*, 638 F.2d 570, 577 (3d Cir.1980), the Third Circuit held that the National Institute for Occupational Safety and Health ("NIOSH") could compel the production of employee medical records from a private corporation. The court noted that governmental intrusion into medical records is permitted only after a finding that the societal interest in disclosure outweighs the individual's privacy interest on the specific facts of the case. *Id.* at 578. The court stated that the factors to be considered include (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosures; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access. *Id.* In finding that NIOSH could compel production of the documents, the Third Circuit affirmed the trial court's finding that NIOSH's security precautions sufficiently assured nondisclosure by the agency. *Id.* at 580.

*Westinghouse*, however, addresses compelled disclosure of medical records to the government. This case is somewhat different than *Westinghouse* and its progeny because Jane Doe's husband voluntarily gave the information to the police. *See United States v. Westinghouse*, 638 F.2d 570, 577 (3d Cir.1980). *See also In re Search Warrant (Sealed)*, 810 F.2d 67, 71 (3d Cir.), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987); *Trade Waste Management Ass'n, Inc. v. Hughey*,

780 F.2d 221, 234 (3d Cir.1985). Third Circuit precedents are silent on the duty of the government to protect medical information once such confidential information is disclosed to the government.

The United States Supreme Court has indicated that the government's duty to avoid unwarranted disclosures arguably has its roots in the federal Constitution. In *Whalen v. Roe*, 429 U.S. 589, 606, 97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977), the United States Supreme Court held that a New York state statute that required the recording, in a centralized computer, of the names of persons receiving prescriptions for drugs that had a lawful and unlawful market did not contravene the requirements of the fourteenth amendment. The statute expressly prohibited public disclosure of the identity of patients. *Id.* at 594, 97 S.Ct. at 873. Additionally, the state Department of Health took security measures to prevent unwarranted disclosure of patient information. *Id.* at 593–95, 97 S.Ct. at 873–74.

The Court noted that it was not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information. Moreover, the Court stated that the right to collect and to use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosure. *Id.* at 605, 97 S.Ct. at 879. The Court stated that *Whalen v. Roe* did not decide whether unwarranted disclosure from a government system without comparable security provisions, made intentionally or unintentionally, would violate the fourteenth amendment. *Id.* at 605–06, 97 S.Ct. at 879. The Court specifically found that the New York statute evidenced a proper concern with protection of the individual's privacy interest. *Id.* at 605, 97 S.Ct. at 879. The case suggests that, absent the nondisclosure provisions, the statute might violate the fourteenth amendment.

Lower courts have held that, once the government has confidential information, it has the obligation to avoid disclosure of the information. In *Carter v. Broadlawns Medical Center*, 667 F.Supp. 1269, 1282 (S.D.Iowa 1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 1569, 103 L.Ed.2d 935 (1989), the court held that a public hospital had violated plaintiffs' constitutional rights by giving chaplains open access to patient medical records without patient authorization. The court noted that, in permitting free access to medical records, the hospital did not properly respect a patient's confidentiality and privacy as recognized in *Whalen v. Roe*, 429 U.S. 589, 599 n. 23, 97 S.Ct. 869, 876 n. 23, 51 L.Ed.2d 64 (1977). The court concluded that a chaplain could review patient medical records only upon prior express approval of the individual patient or his or her guardian. The court noted that this restriction is not so broad as to bar doctors, medical and psychiatric personnel, and nurses from providing basic, unprivileged information to chaplains. The case demonstrates that, not only is the government restricted from collecting personal medical information, it may be restricted from disclosing such private information it lawfully receives.

At least one court has addressed disclosure of a patient's condition with AIDS. In *Woods v. White*, 689 F.Supp. 874, 876 (W.D.Wis.1988), the court held that prison officials who discussed the fact that plaintiff had tested positive for AIDS with nonmedical prison personnel and with other inmates violated the inmate's constitutional rights and could be held liable under section 1983. The court recognized plaintiff's privacy interest in the information. The court stated that, to define the scope of the right to privacy in personal information, it must balance the individual's right to confidentiality against the governmental interest in disclosure. *Id.* The court noted that information about one's body and state of health is particularly sensitive, and that such information has traditionally been treated differently from other types of personal information. *Id.* (citing *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir.1980)). Noting the most publicized aspect of the disease, that it is related more closely than other diseases to sexual activity and intravenous drug use, the court stated that "it is difficult to argue that information about this

disease is not information of the most personal kind, or that an individual would not have an interest in protecting against the dissemination of such information." *Id.* The court held that plaintiff had a constitutional right to privacy in his medical records. *Id.*

The court then dismissed the need to balance plaintiff's interest against the governmental interest involved because defendants made no claim that any important governmental interest was served by their informal discussion of plaintiff's positive test for the AIDS virus. Recognizing that there might be circumstances that would limit plaintiff's right to privacy of his condition, the court noted that this case did not present such circumstances.[7]

This court finds the reasoning employed by the *Carter* and *Woods* courts persuasive. The sensitive nature of medical information about AIDS makes a compelling argument for keeping this information confidential. Society's moral judgments about the high-risk activities associated with the disease, including sexual relations and drug use, make the information of the most personal kind. Also, the privacy interest in one's exposure to the AIDS virus is even greater than one's privacy interest in ordinary medical records because of the stigma that attaches with the disease. The potential for harm in the event of a nonconsensual disclosure is substantial; plaintiff's brief details the stigma and harassment that comes with public knowledge of one's affliction with AIDS.[8]

The hysteria surrounding AIDS extends beyond those who have the disease. The stigma attaches not only to the AIDS victim, but to those in contact with AIDS patients, *see* N.Y. Times, Sept. 8, 1985, at A1, col. 1 (doctor of gay patients threatened with eviction), and to those in high risk groups who do not have the disease. *See Poff v. Caro*, 228 N.J.Super. 370, 374, 549 A.2d 900, 903 (N.J.Super.Law Div.1987) (landlord refused to rent to three gay men for fear of AIDS); Newsweek, July 1, 1985,

---

7. The court then held that plaintiff retained his right to privacy even though he was incarcerated. *Woods v. White*, 689 F.Supp. 874, 876 (W.D. Wis.1988) (citing *Torres v. Wisconsin Department of Health & Social Services*, 838 F.2d 944, 951 (7th Cir.1988); *Kimberlin v. United States Department of Justice*, 788 F.2d 434, 439 n. 6 (7th Cir.1986)). The court also rejected defendants' defense of qualified immunity because casual, unjustified dissemination of confidential medical information to nonmedical staff and other prisoners could "scarcely be said to belong to the sphere of defendants' discretionary functions." *Id.* at 877.

8. Plaintiffs' brief lists numerous examples of the hysteria AIDS provokes, *e.g.,* a teacher with AIDS was removed from teaching duties, *Chalk v. United States District Court*, 840 F.2d 701, 703 (9th Cir.1988); a landlord refused to rent an apartment to three gay men for fear of AIDS, *Poff v. Caro*, 228 N.J.Super. 370, 374, 549 A.2d 900, 903 (N.J.Super.Law Div.1987); a Florida family whose hemophiliac children tested positive for HIV had their house firebombed and were driven out of town, Washington Post, Sept. 11, 1987, at B1; doctors and health care workers refused to treat people with or suspected of having AIDS, Newsweek, Sept. 23, 1987; coworkers of an AIDS victim refused to use a truck previously driven by him and threatened to kill the victim if he ever returned to work from a leave of absence, Time, Aug. 25, 1986, at 48 (resulting lawsuit settled, *Cronan v. New Eng-* *land Telephone*, No. 80332 (Mass.Super.Ct. 1986)); police in Michigan filed a charge of attempted murder against an AIDS victim who spat at them, U.S. News & World Rep., Mar. 24, 1986, at 73; a judge in Florida required AIDS victims to wear masks in his courtroom, cited in Freedman, *Wrong Without Remedy*, 72 A.B.A.J. 34, 40 (1986); as of 1985, children with AIDS had been denied access to schools in Denver, Colorado, New Haven, Connecticut, Plainfield, New Jersey, Troy, Georgia, and Kokomo, Indiana, Nat'l L.J., Nov. 25, 1985, at 1, col. 2; a doctor of gay patients was threatened with eviction, N.Y. Times, Oct. 25, 1985, at 27, col. 1; parents boycotted a public school in New York City after a child with AIDS was allowed to attend, N.Y. Times, Sept. 8, 1985, at A1, col. 1; healthy gay men who came to work with rashes or chest colds were getting fired because of AIDS phobia, Newsweek, July 1, 1985, at 61; Los Angeles paramedics denied prompt assistance to a heart attack victim because they feared he had AIDS, cited in Parry, *AIDS as a Handicapping Condition*, 9 Med. & Physical Disability L.Rep. 402 (1985); police officers refused to drive a prisoner with AIDS to the hospital, N.Y. Times, Oct. 7, 1983, at B7, col. 5; some California police demanded rubber masks and gloves be used when dealing with gays, Nat'l L.J., July 25, 1983, at 3, 11; Haitians are denied employment because of fear of AIDS, N.Y. Times, June 28, 1983, at A18, col. 1, 4; funeral directors were urged not to embalm bodies of AIDS victims, N.Y. Times, June 18, 1983 at 27, col. 5.

at 61 (healthy gay men fired because of AIDS phobia); Nat'l L.J., July 25, 1983, at 3, 11 (California police demand masks and rubber gloves be used when dealing with gays); N.Y. Times, June 28, 1983, at A18, col. 1, 4 (Haitians denied employment because of fear of AIDS). Revealing that one's family or household member has AIDS causes the entire family to be ostracized. The right to privacy in this information extends to members of the AIDS patient's immediate family. Those sharing a household with an infected person suffer from disclosure just as the victim does. Family members, therefore, have a substantial interest in keeping this information confidential. Disclosures about AIDS cause a violation of the family's privacy much greater than simply revealing any other aspect of their family medical history.

■ An individual's privacy interest in medical information and records is not absolute. The court must determine whether the societal interest in disclosure outweighs the privacy interest involved. *United States v. Westinghouse*, 638 F.2d at 578. To avoid a constitutional violation, the government must show a compelling state interest in breaching that privacy. *McKenna v. Fargo*, 451 F.Supp. 1355, 1381 (D.N.J. 1978).

■ The government's interest in disclosure here does not outweigh the substantial privacy interest involved. The government has not shown a compelling state interest in breaching the Does' privacy. The government contends that Officer Smith advised the DiAngelos to wash with disinfectant because of his concern for the prevention and avoidance of AIDS, an incurable and contagious disease. While prevention of this deadly disease is clearly an appropriate state objective, this objective was not served by Smith's statement that the DiAngelos should wash with disinfectant. Disclosure of the Does' confidential information did not advance a compelling governmental interest in preventing the spread of the disease because there was no risk that Mr. or Mrs. DiAngelo might be exposed to the HIV virus through casual contact with Jane Doe. The state of medical knowledge at the time of this incident established that AIDS is not transmitted by casual contact. Smith's statement could not prevent the transmission of AIDS because there was no threat of transmission present.

This court concludes that the Does have a constitutional right of privacy in the information disclosed by Smith and the state had no compelling interest in revealing that information. As such, the disclosure violated the Does' constitutional rights. This conclusion is consistent with the United States Supreme Court's discussion in *Whalen v. Roe*, 429 U.S. 589, 605, 97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977) that the government may have a duty to avoid disclosure of personal information. Although side-stepping the question of whether the government had the duty to protect confidential information it lawfully obtains, the Court suggested that such a duty exists. *See id.* at 605–06, 97 S.Ct. at 879.

1. Defendant Smith.

To maintain an action under 42 U.S.C. § 1983 (1982) against Officer Smith, plaintiffs must show (1) that Smith deprived them of a right secured by the "Constitution and laws of the United States," and (2) that Smith deprived them of this right "under color of any statute, ordinance, regulation, custom, usage, of any State or Territory." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). The second element requires that plaintiffs show that defendant Smith acted "under color of law." *Id.* Plaintiffs have established that defendant Smith's disclosure violated their constitutional right to privacy. Additionally, Smith was acting in his capacity as a police officer for Runnemede at all times relevant to this case, therefore, he was acting under color of state law within the meaning of section 1983. *See Black v. Stephens*, 662 F.2d 181, 188 (3d Cir.1981), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). Section 1983 liability attaches.

Defendant Smith did not assert a qualified immunity defense. Officials perform-

ing discretionary functions are not liable if their conduct does not violate a clearly established constitutional or statutory right of which a reasonable person should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Additionally, the contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Defendants did not raise the issue in their brief, and when asked at oral argument, counsel for Smith stated that defendants relied on their procedural arguments. Qualified immunity is an affirmative defense that is waived if not pleaded. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). The court can not consider this defense.

■ Defendant Smith raises several other defenses. First, Smith argues that plaintiffs have no standing to bring this action because Smith's statement violated only the privacy rights of Jane Doe's husband. (citing *Tyree v. Smith,* 289 F.Supp. 174 (E.D.Tenn.1968) (father has no standing to sue for denial of constitutional rights of his children)). The father in *Tyree* filed a section 1983 suit for violations of his son's constitutional rights as guardian for his minor son and individually. The father did not allege violations of his own civil rights. The court found that the father had no standing to sue for violations of his son's civil rights. *Id.* at 175. The court ordered that the father could not recover damages in his own right, however, the case proceeded against defendants with the father acting as representative for his minor son. *Id.* at 178.

Plaintiffs here do not assert the constitutional rights of Jane Doe's husband. Jane Doe sues as guardian for her minor children for the violation of their own rights to privacy. The children have standing to sue for the violation of their right to privacy from governmental disclosure of their father's infection with AIDS. Likewise, Jane Doe individually asserts a violation of her constitutional right to privacy. That the

officer did not reveal information about the children's own medical condition is immaterial. A family member's diagnosis with AIDS is a personal matter, as defined in *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977), that falls within the protection of the Constitution.

This court rejects the standing argument because Smith's statement communicated private, confidential information about Jane Doe and her children. The stigma of AIDS extends to all family members, whether or not they actually have the disease. Smith's statement also implicitly suggested that Jane Doe herself might somehow transmit the disease to the DiAngelos. Jane Doe clearly has standing to assert a violation of her right to privacy.

■ Next, defendant Smith asserts that, because his actions did not amount to misconduct, no action can be maintained under section 1983. While misconduct often accompanies a section 1983 violation, section 1983 does not require misconduct. The plain terms of section 1983 require two allegations to state a cause of action. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). The statute provides that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen ... to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured." Civil Rights Act of 1871, 42 U.S.C. § 1983 (1982). Misconduct is not a prerequisite to plaintiffs' prevailing under section 1983. This defense is also rejected.

■ Smith asserts that, because Jane Doe's husband told police that he had AIDS, the husband "published" the information, giving up any right to privacy in the information. Defendants do not cite any authority for this premise, but ask the court to use its "common sense." Defendant confuses a federal cause of action under section 1983 for violation of plaintiffs' constitutional right to privacy with a state tort claim for invasion of privacy. The court has found no authority that publication by plaintiff eliminates a cause of

action against the government for a federal constitutional violation of one's right to privacy. Additionally, "common sense" requires analysis of the underlying policy supporting Jane Doe's husband's selective disclosure of his condition to police.

Clearly, an arrestee's disclosure to police that he or she has AIDS is preferable to nondisclosure. Police can take whatever precautions are necessary to prevent transmission of the disease. Police have more than "casual contact" with arrestee, increasing the likelihood that the disease can be transmitted. For example, by frisking an arrested person, police may come into contact with hypodermic needles. Thus, disclosure should be encouraged to protect police officers. Common sense demands that persons with AIDS be able to make such disclosures without fear that police will inform neighbors, employers, or the media. Smith's publication argument, therefore, is rejected as contrary to public policy.

 Finally, Smith asserts that there are no conclusive facts about AIDS, thus his warning to the DiAngelos was justified. As discussed, *supra*, defendant ignores the multitude of information, available in 1987, that flatly rejects his argument that AIDS may be spread through casual contact. This court will not rely on defendant's speculation that further AIDS research may reveal that the virus could be infectious by means currently unknown.

Defendant additionally has failed to assert a single fact to show that Jane Doe had *any* physical contact with the DiAngelos. Thus, his "justification" argument fails. Assuming *arguendo* that the disease could be transmitted by casual contact, defendant has failed to put forth facts to show that the DiAngelos had such contact with Jane Doe.

Smith does not cite any case to support the contention that justified actions are not actionable under section 1983. Perhaps this contention is defendant's inartful attempt to assert qualified immunity. The defendant, however, has the burden to prove the defense of qualified immunity. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Because he has not met this burden, Smith has not established that his conduct gives rise to qualified immunity.

This court rejects the defenses asserted by Smith for his conduct. Smith has failed to produce evidence that, in light of his burden of proof at trial, could be the basis for a jury finding in his favor, thus, summary judgment for plaintiffs is appropriate here.

2. Defendant Borough of Runnemede.

To maintain an action under section 1983 against Runnemede, plaintiffs must show that the unconstitutional actions of a municipal employee were taken pursuant to municipal policy or custom. *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Plaintiffs must also establish a "direct causal link" between the unconstitutional municipal policy or custom and the actions of the municipal employee to establish liability. *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir. 1984).

Plaintiffs assert two theories for municipal liability. Plaintiffs assert that Runnemede's failure to train its employees about AIDS and the need to keep the identity of AIDS carriers confidential caused the constitutional violation of their privacy. Next, plaintiffs assert that Runnemede had a unconstitutional custom or policy of not protecting confidential information as evidenced by its failure to have an affirmative policy on the dissemination of confidential information obtained during investigations.

a. *Failure to Train.*

 The United States Supreme Court recently clarified the standard by which municipalities could be held liable under section 1983 for failure to train. Inadequacy of police training may serve as the basis for section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police came into contact." *City of Canton*

*v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Only where a failure to train reflects a "deliberate" or "conscious" choice by municipalities can a city be liable for such a failure under section 1983. *Id.* 109 S.Ct. at 1205. The municipality's failure to train must be the "moving force [behind] the constitutional violation" for liability under section 1983. *Id.*

In *City of Canton v. Harris,* police did not summon medical help for an arrestee in their custody. Harris was found sitting on the floor of the police wagon used to transport her to the police station. When asked if she needed medical attention, Harris responded with an incoherent remark. Harris slumped to the floor on two occasions while inside the police station for processing; eventually, officers left her lying on the floor to prevent her falling again. After her release from custody, an ambulance took her to a nearby hospital, where she was hospitalized for a week. *Id.* at 1200–01.

The Court noted that the city's policy with respect to medical treatment for detainees was constitutional on its face.[9] It rejected the municipality's contention that liability could attach only if "the policy in question [is] itself unconstitutional." *Id.* at 1203. The Court also stated that a city was not automatically liable merely because an employee applied the policy in an unconstitutional manner, for then liability would rest on *respondeat superior. Id.*

Reasoning that inadequate training cannot always be said to represent city policy, the Court held that the inadequacy of police training may serve as the basis for section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police came into contact." *Id.* at 1204. Only where a failure to train reflects a "deliberate" or "conscious" choice by municipalities can a city be liable for such a failure under section 1983. *Id.* at 1205.

The Court defined "deliberate indifference" as:

> [I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.*

In a footnote, the Court gave an example of when a municipality could be liable for an unconstitutional failure to train:

> [C]ity policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 1205 n. 10 (citation omitted).

*City of Canton,* however, offers little guidance to courts applying the "deliberate indifference" standard to specific factual scenarios. Finding that the district court in *City of Canton* used a lesser burden of proof, the Court remanded the case to the court of appeals to determine whether plaintiff should have an opportunity to prove that the deficiency in training actually caused the police officers' indifference to her medical needs. *Id.* at 1207. Justice O'Connor's opinion, concurring in part and dissenting in part, stated that she believed that plaintiff had not and could not satisfy the Court's standard for fault and causation. She suggested that the Court's opinion strongly hinted at this conclusion. *Id.*

---

9. The policy states that the City Jailer "shall ... have [a person needing medical care] taken to a hospital for medical treatment, with permission of his [or her] supervisor...." *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).

(O'Connor, J., concurring in part and dissenting in part).

Applying the *City of Canton v. Harris* standard to the instant case, this court finds that defendants can not avoid plaintiffs' motion for summary judgment that their failure to train officers about AIDS caused the violation of the Does' constitutional right to privacy.

In light of the duties assigned to police officers, the need for police training about AIDS is obvious. Officers frequently come into contact with members of high risk populations, such as intravenous drug users,[10] therefore, police must understand the disease and its transmission to protect themselves and the public. The nature of an officer's duties may bring him or her into contact with bodily fluids, particularly blood, or with nonsterile hypodermic needles.

Additionally, the need for police training to keep confidential one's infection with the AIDS virus is obvious. With the hysteria that surrounds AIDS victims and their families, disclosure clearly has a devastating effect that is easily anticipated. The panic sparked by AIDS was widely known in 1987. The failure to instruct officers to keep information about AIDS carriers confidential was likely to result in disclosure and fan the flames of hysteria. Runnemede's failure to train officers, therefore, was likely to result in a violation of constitutional rights.

The absence of training here is also a deliberate and conscious choice by the municipality. Police Chief James M. Leason testified in his deposition that he knew AIDS was a serious disease, almost always fatal, and prevalent within a population that was a prime target of police operations, that is, intravenous drug users. He also testified in his deposition that, prior to the incident, he had heard from other police chiefs in the county about various precautions being taken to protect police officers from AIDS. Yet, the Borough of Runnemede did not train any officers about AIDS prevention and control. The Borough did not provide an operating procedure or policy to guide officers. The police chief should have known that officers untrained as to the medical facts about AIDS would act out of panic, ignorance, and fear when confronted with a person having or suspected of having AIDS, and that such a confrontation was likely to occur. Knowing that other communities had taken precautions to protect officers from AIDS, Runnemede did not establish its own policy or instruct officers about precautions. As such, Runnemede made a conscious decision not to train its officers about the disease.

The failure to train officers about AIDS and the need to keep confidential the identity of AIDS victims caused the violation of the Does' constitutional rights. Clearly, Officer Smith's ignorance about the disease caused the improper disclosure. Smith's police report to Chief Leason stated his reason for disclosing the information:

Fearing that [Jane Doe] may have had physical contact with Mr. and Mrs. DiAngelo [and acting] in my capacity as a police officer[,] being my responsibility to protect the public, I believe it was my duty to inform the noted parties of the possible hazard that may have been at hand.

An officer trained as to the facts about AIDS would have known that no hazard of transmission of the virus existed under the circumstances, whether or not Jane Doe came into physical contact with the DiAngelos. Failure to train officers on the basic facts about AIDS assured that officers coming into contact with AIDS carriers would be ill-equipped to evaluate the risk of transmission present.

Runnemede's failure to train its officers about AIDS and the need to keep confidential the identity of those known to police to have the disease falls within the Supreme Court's definition of "deliberate indifference" that caused the violation of the Does' constitutional rights. The case is analogous to the Supreme Court's example in *City of Canton v. Harris* for the use of

---

**10.** Intravenous drug users account for 54 percent of the reported adult AIDS cases in New Jersey. N.J. Dep't of Health, *AIDS Cases, State of New Jersey as of February 28, 1989,* at 2.

deadly force against fleeing felons. *See City of Canton v. Harris*, — U.S. —, 109 S.Ct. 1197, 1205 n. 10, 103 L.Ed.2d 412 (1989). City policy makers must know to a moral certainty that their police officers will come into contact with those known or suspected to have AIDS and that transmission of the disease will cause death. The need to train officers about AIDS and its transmission and about the constitutional limitations on the disclosure of the identity of AIDS carriers is so obvious that failure to do so is properly characterized as deliberate indifference to constitutional rights.

Defendant Runnemede asserts that no other municipality or state agency had a policy in place, and therefore it had no obligation to have a policy in place. Defendant maintains that this comparison to other departments establishes that there was no deliberate indifference. Defendant cites no authority to support this theory.

Municipalities must abide by the Constitution regardless of what other municipalities do or fail to do. That other municipalities do not have policies regarding AIDS is not material to the analysis set forth in *City of Canton v. Harris*, — U.S. —, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Section 1983 liability attaches "where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police came into contact." *Id.* 109 S.Ct. at 1204. Only where a failure to train reflects a "deliberate" or "conscious" choice by municipalities can a city be liable for such a failure under section 1983. *Id.* at 1205. The standard leaves no room for comparison with the failures of other municipalities. This defense is rejected.

This court concludes, therefore, that defendant Runnemede has failed to produce evidence that, in light of its burden of proof at trial, could be the basis for a jury finding in its favor. Summary judgment for plaintiffs on their claim against Runne-

mede that its failure to train officers about AIDS caused the violation of the Does' constitutional right to privacy will be granted.

This court notes that it does not decide whether a municipality may reveal one's affliction with AIDS to those actually at risk of contracting the disease from a known AIDS carrier. Likewise, municipal liability is restricted to failure to train about the disease AIDS. The need for training about AIDS and the need to keep the identity of AIDS carriers confidential satisfies the Supreme Court's standard that the need for training be so obvious that failure to do so amounts to deliberate indifference; training about other confidential matters or their disclosure may not be so obvious. No other disease in recent history has sparked such widespread and publicized panic and hysteria. One's condition with AIDS is a unique personal matter; its disclosure provokes a regrettable, but predictable, response from the community that disclosure of other personal matters would not provoke. Thus, municipal liability for disclosure of this personal matter is appropriate.

### b. *Unconstitutional Policy.*

█ Plaintiffs' second theory for municipal liability is that Runnemede had an unconstitutional policy of failing to recognize its duty to safeguard private or confidential information. This theory appears to restate plaintiffs' theory of liability for failure to train.[11] The absence of a uniform policy, however, may also be viewed as an affirmative policy leaving decisions about disclosure to the discretion of individual officers. Plaintiffs contend that this policy is unconstitutional.

Defendant asserts that Runnemede merely follows the guidelines promulgated by the Attorney General of New Jersey and the State Police. It contends that absent a federal or state requirement to formulate a policy, it can not be held liable for failure to formulate a policy. This defense

---

**11.** Plaintiffs cite *Mairena v. Foti,* 816 F.2d 1061, 1065 (5th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *Garris v. Rowland,* 678 F.2d 1264, 1274–75 (5th Cir.), *cert. denied,* 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d

121 (1982) for the proposition that a municipality may incur liability for failure to have an affirmative policy, however, there is no Third Circuit case imposing liability against a municipality for "failure to have an affirmative policy."

is rejected. There is no impediment to Runnemede's formulating its own policy; that it chooses not to do so does not absolve it from liability for its constitutional violations, for example, for failure to train.

The court nonetheless finds that plaintiffs can not prevail on summary judgment on this theory of liability. Plaintiffs have offered no authority that the policy of leaving the disclosure decision to the individual officer is unconstitutional. The municipality can not be found liable under section 1983 if the individual officer makes a decision that results in a constitutional violation unless the officer's action is officially sanctioned or ordered by the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). "Official policy" refers to formal rules or understandings that are intended to and do establish fixed plans of action to be followed under similar circumstances consistently and over time. *Id.* at 480–81, 106 S.Ct. at 1298–99. Leaving the disclosure decision to individual officers, by definition, can not rise to the level of official policy because it does not establish a fixed plan of action to be followed under similar circumstances and can not result in consistency. Additionally, in this case, plaintiffs have not offered any evidence that Officer Smith's actions were ordered or sanctioned by Runnemede. Plaintiffs motion for summary judgment based on this theory of liability can not prevail.

## III. CONCLUSION

This court finds that plaintiffs have established that defendants Smith and Runnemede violated their constitutional right to privacy and that defendants are liable under section 1983. Plaintiffs' motion for summary judgment on the issue of liability with respect to defendants Smith and Runnemede will be granted. Likewise, the cross-motion for summary judgment of defendants Smith and Runnemede will be denied.

An appropriate order will be entered.