**STATE of Missouri, Respondent,**

v.

**Debra Lynn DEES, Appellant.**

**Nos. WD 48052, WD 50177.**

Missouri Court of Appeals,
Western District.

Dec. 12, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 1996.

Application to Transfer Denied
March 26, 1996.

---

Elizabeth Unger Carlyle, Lee's Summit, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, Philip M. Koppe, Assistant Attorney General, Kansas City, for respondent.

Before LAURA DENVIR STITH, P.J., and LOWENSTEIN and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Debra Lynn Dees was found guilty of murder in the first degree, § 565.020.1, RSMo Cum.Supp.1992, and armed criminal action, § 571.015, RSMo Cum.Supp.1992, as a result of the shooting death of her husband, Ronald Dees. She was sentenced to a term of life imprisonment without probation or parole for murder in the first degree and a concurrent 15-year term for armed criminal action. She appeals her conviction on the following grounds: (1) that plain error occurred when the prosecutor commented on her failure to testify by stating that "she is in court, because she hasn't come forward and given truthful testimony"; (2) that jury Instruction No. 9 improperly permitted the jury to find Ms. Dees guilty if she aided either Mr. Waring or Mr. Lair in committing the offense; (3) that there was insufficient evidence to support her conviction of aiding and abetting Mr. Lair; (4) that the trial court erred in admitting allegedly inflammatory and irrelevant photographs of Mr. Dees' dead body; and (5) that she was denied effective assistance of counsel because her trial counsel failed: (a) to object to the prosecutor's comment on her failure to testify; (b) to present

her testimony at trial; (c) to challenge the voluntariness of her custodial statement; and (d) to present other available evidence on Ms. Dees' behalf.

We find that the prosecutor did improperly comment directly on her failure to testify but that, under the Missouri Supreme Court's decision in *State v. Kempker*, 824 S.W.2d 909 (Mo. banc 1992), this does not entitle Ms. Dees to a new trial because she failed to object to the comment or to request an instruction to the jury, and no manifest injustice occurred as a result of the prosecutor's single error during closing argument. We find that the other claims of error also either were not preserved or are not well taken and, accordingly, we affirm the conviction.

## 1. FACTUAL AND PROCEDURAL BACKGROUND

■ In determining whether a submissible case was made, we review the evidence and reasonable inferences therefrom in the light most favorable to the State and disregard all contrary evidence and inferences. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). Ms. Dees is a 32-year-old woman who was married to the victim, Ronald Dees. They lived in Excelsior Springs, Missouri. She was also involved in an extramarital affair with her co-defendant, Richard Shane Waring, an 18-year-old high school student. Mr. Waring and Ms. Dees had met the previous summer when both were working at a local grocery store. After several months had passed, Ms. Dees told Mr. Waring that Mr. Dees had refused to agree to a divorce, and had stated that the only way she was going to get rid of him was to have him killed.

Ms. Dees and Mr. Waring began making plans to kill Mr. Dees. Mr. Waring stated that Ms. Dees suggested using a third party to kill Mr. Dees so that the two of them would not be implicated in his death. With this in mind, Mr. Waring approached a number of people about killing Mr. Dees, including Matt Cinadr, Brian Keel and Jonathan Lair.

Mr. Cinadr testified that his first discussion with Mr. Waring and Ms. Dees about killing Mr. Dees was at a party at the Dees'

residence. Late in the evening, Mr. Waring called Mr. Cinadr into the house. Mr. Waring, Ms. Dees and Mr. Cinadr then went into the Dees' bedroom and Mr. Waring showed Mr. Cinadr where Mr. Dees kept his firearms. Mr. Waring told Mr. Cinadr that if Mr. Cinadr wanted to kill Mr. Dees, he could do it that night at the party. Ms. Dees, standing beside Mr. Waring during this conversation, said nothing.

When questioned the next morning by Mr. Waring, Mr. Cinadr agreed to kill Mr. Dees for $6,000 and Mr. Dees' Camaro. Mr. Waring told Mr. Cinadr that he would be paid from the proceeds of Mr. Dees' life insurance policy.[1] Ms. Dees, also present during this conversation, again made no comment.

Mr. Cinadr moved into the Dees' home in January and continued to reside with the Dees until Mr. Dees' death. During this period, Mr. Waring and Ms. Dees frequently talked with Mr. Cinadr about killing Mr. Dees. Although Mr. Waring usually did the talking, Ms. Dees was present during at least three-fourths of these conversations.

Mr. Waring and Mr. Cinadr made several plans in Ms. Dees' presence to kill Mr. Dees, but Mr. Cinadr was never able to go through with the actual act of killing Mr. Dees. At one point, in furtherance of a plan to make it appear as though Mr. Dees were killed in a drive-by shooting, Mr. Waring shot Mr. Cinadr in the right upper thigh with one of Mr. Dees' firearms. Ms. Dees, when previously told of this plan, had made no objection other than to the shooting of Mr. Cinadr. After Mr. Waring shot Mr. Cinadr, Ms. Dees and Mr. Waring took Mr. Cinadr to the hospital. Mr. Cinadr reported that he had been shot in a drive-by shooting. Mr. Cinadr planned to shoot Mr. Dees a couple of days later in what he hoped would also appear to be a drive-by shooting, thus drawing suspicion away from the occupants of the Dees' household. Mr. Cinadr never carried through the plan to shoot Mr. Dees, however.

When Mr. Cinadr proved unable to kill Mr. Dees, Mr. Waring began investigating other possible assailants. While driving through town approximately three to five weeks before Mr. Dees was shot, Mr. Waring and Ms. Dees stopped to talk with Brian Keel, Shannon McFee and Corey Jones. Messrs. Keel, McFee and Jones approached the car and started talking about the plan to kill Mr. Dees. Mr. Waring asked them to wait while he got out of the car. He then stepped up on the sidewalk and started talking to them about killing Mr. Dees. Ms. Dees then got out of the car and told them to hold it down because her daughter, Trisha, was in the car and she didn't want Trisha to know about their plans. Ms. Dees went on to tell Mr. Keel that she wanted the killing done quickly and that she wanted the diamond earring Mr. Dees was wearing.

Mr. Waring also discussed killing Mr. Dees with Mr. Lair. Mr. Lair initially heard from Terry Shroyer that Mr. Waring was looking for someone to kill Mr. Dees for $6,000. When Mr. Lair commented that he would "think about that," Mr. Shroyer set up a meeting at his house between Mr. Waring and Mr. Lair about two weeks prior to the killing. Mr. Waring told Mr. Lair that he and Ms. Dees wanted to be together and that they needed Mr. Dees out of the way. Mr. Waring and Mr. Lair discussed ways in which the killing could be carried out. Mr. Waring testified that, after meeting with Mr. Lair, Mr. Waring told Ms. Dees that he had approached Mr. Lair about killing Mr. Dees and she agreed to the killing of Mr. Dees by Mr. Lair.

About a week prior to the murder, Mr. Waring picked Mr. Lair up in downtown Excelsior Springs while Mr. Waring was driving Mr. Dees' Camaro. They drove around and then parked in a lot. Mr. Waring gave Mr. Lair a gun and told him that "[w]e need this done soon." Mr. Waring said he could drop off Mr. Lair on Y Highway on either Thursday or Friday shortly before Mr. Dees came home from work, and Mr. Lair could then flag Mr. Dees down and kill him. Heavy snowfall, however, prevented Mr. Waring from picking Mr. Lair up as arranged. On the following Saturday or Sunday, Mr. Waring and Mr. Lair met at Mr.

---

1. Mr. Waring testified that Ms. Dees told him that Mr. Dees had "lots of insurance" and that they could pay for the killing with the proceeds from this insurance.

Waring's request so that Mr. Waring could get the gun back before Mr. Dees missed it.

The next meeting occurred when Mr. Waring and Ms. Dees pulled her car into the parking lot of an ice cream shop. Both Mr. Waring and Ms. Dees got out of the car and approached Mr. Lair. Mr. Waring told Mr. Lair that "[w]e need to get this done. He's starting to hurt her more and more, giving her hard times." Ms. Dees, standing next to Mr. Waring, did not comment but occasionally nodded her head affirmatively. Mr. Waring then invited Mr. Lair to a party at the Dees' residence on Saturday night so that Mr. Lair would have another chance to kill Mr. Dees.

Mr. Lair went to the Dees' party on the Saturday night before he killed Mr. Dees, arriving late in the evening. During the evening, he was stopped by Mr. Waring and Ms. Dees, who were talking. Mr. Waring said that "[y]ou've got to get this done . . . tomorrow" and that "[t]here's being real problems." Mr. Lair replied, "I don't know if I'm going to be able to do it. . . . I'm having second thoughts." Mr. Waring told Mr. Lair that he needed to make up his mind. After a brief pause, Ms. Dees said, "Well, if it helps you make your decision, he raped me again last night." There was no further conversation.

The next morning, Mr. Waring took Ms. Dees to work and then returned to the Dees' house with his cousin, Gary Sharp. Mr. Lair had spent the night at the Dees' home and was still there when Mr. Waring arrived. As the men prepared to leave the Dees home, Mr. Waring motioned for Mr. Lair to step into the bedroom, and then handed Mr. Lair one of Mr. Dees' firearms. Mr. Lair put the gun in his pocket. Mr. Waring, Mr. Sharp and Mr. Lair then left in Mr. Dees' Camaro. As they were driving on the highway, Mr. Dees drove past them and saw Mr. Waring driving the car. Mr. Waring told Mr. Lair, "You've got to do it now. He's already seen me driving the car. He's probably pissed off. He'll be coming after me."

Mr. Lair got out of the car at the next hill. He ran to a nearby ice cream shop and then started walking down the highway. Shortly thereafter, Mr. Dees drove up to him and asked him where Mr. Waring was. Mr. Lair replied that he did not know and asked for a ride home. Mr. Dees agreed, but told him that "there's a couple of things I need to take care of first." Mr. Lair got in the car and they drove to the grocery store where Ms. Dees was working. Mr. Dees went inside while Mr. Lair remained in the car. Mr. Dees returned about 10 minutes later and started to take Mr. Lair home. Mr. Lair then remembered that he had left his cigarettes at the Dees' house, so they returned to the Dees' house.

When they arrived at the Dees' house, Mr. Dees went into his bedroom and started opening drawers. He then came out of the bedroom and said that "[n]obody's getting away with something that I paid for with money that I worked hard for." Mr. Lair thought that Mr. Dees was referring to the pistol which Mr. Lair had received from Mr. Waring that morning and which was in Mr. Lair's jacket pocket.

Mr. Dees again started to take Mr. Lair home. As they turned off the highway and started back through town, Mr. Dees saw Mr. Waring walking past. Mr. Dees turned onto Lee Street in front of Mr. Waring and waited for Mr. Waring to reach the car.

While Mr. Dees was watching Mr. Waring, Mr. Lair shot him three times in the head. Mr. Lair then jumped out of the car and ran down the sidewalk. He turned down the street and started running down the Fishing River Trail. He threw the gun in the river and was standing in front of a pool hall when his cousin, Melinda Dowler, drove by and picked him up.

The police spoke briefly with Mr. Waring at the scene of the murder. He was later interviewed on two separate occasions at the police station. After giving a second statement to the police, Mr. Waring called Mr. Lair and asked him to turn himself in so that Mr. Waring and Ms. Dees could get on with their lives and stay out of jail.

Ms. Dees was also questioned by the police after the murder. Initially, she indicated that she knew nothing about her husband's death and knew of no one who wanted to harm him. However, after being confronted

with Mr. Waring's earlier statements, Ms. Dees admitted that she and Mr. Waring had been involved in a sexual relationship for the prior six to eight months, that during that time period she was sexually abused by her husband, that she had relayed this information to Mr. Waring and that Mr. Waring was very upset by this information.

Ms. Dees said that, on at least two occasions when she was speaking with Mr. Waring about this sexual abuse by her husband, they discussed finding someone to kill her husband. On the first occasion, about six months prior to the killing, Mr. Waring had contacted Mr. Cinadr to kill Mr. Dees. Ms. Dees stated that when she discovered this, she talked Mr. Cinadr out of doing the killing. About one week prior to the killing, Mr. Waring again brought up the subject of finding someone to kill Mr. Dees. Ms. Dees admitted that, at that point, she neither encouraged nor discouraged Mr. Waring. In addition, Ms. Dees stated that she was aware that her husband had an insurance policy through work. She claimed, however, that she did not know whether the policy would pay if he was injured while not working.

The jury found Ms. Dees guilty of first degree murder and armed criminal action. She was sentenced to a term of life imprisonment without probation or parole for murder in the first degree and a concurrent 15–year term for armed criminal action.

Following trial, Ms. Dees filed a *pro se* motion to vacate, set aside or correct the judgment or sentence. She claimed that her trial counsel was ineffective for a number of reasons, including the failure to call her daughter, Trisha Gottschall, as a witness and the failure to advise Ms. Dees herself to testify. An amended motion, filed by appointed counsel, asserted in addition that her trial counsel had failed "to thoroughly investigate and follow up on information and potential witness[es]" provided to them by Ms. Dees.

After an evidentiary hearing, the trial court overruled Ms. Dees's motion, entering findings of fact and conclusions of law. This appeal followed.

## 2. CRIMINAL APPEAL

### a. Remarks by the Prosecutor in Closing Argument Did Not Constitute Plain Error.

■ Ms. Dees contends that the trial court committed plain error because it failed to declare a mistrial, *sua sponte,* when certain comments made by the assistant prosecutor during the State's closing argument allegedly violated Ms. Dees's statutory and constitutional right to remain silent.

### 1. Remarks Concerning Failure to Testify.

When first questioned by the police after her husband's murder, Ms. Dees chose to give a statement to the police about some matters relevant to the crime, but failed to tell them about the fact that her husband's pistol was gone and that Mr. Waring had told her that Mr. Lair had killed her husband. At trial, as she was entitled to do, Ms. Dees chose not to testify.

■ Because Ms. Dees had waived her right to remain silent in questioning by the police, the prosecutor was entitled to comment in closing argument on the fact that the statement she gave was incomplete. *State v. Bragg,* 867 S.W.2d 284, 292 (Mo.App.1993). He did so extensively, noting that the reason that the State had made a "deal" with Mr. Lair and Mr. Waring was because Ms. Dees had failed to tell the police about her involvement, and so, without a deal with those gentlemen, Ms. Dees "would have walked away" from the crime.

Unfortunately, the prosecutor then used the word "testimony" rather than "statement" in a portion of his closing argument which otherwise dealt with Ms. Dees' failure to be truthful in her statements to the police. Specifically, he stated as follows:

> But, I'll tell you, without the deals you never would have heard the story. You never would have heard Jon Lair get up here and you never would have heard Richard Waring. You never would have heard Cinadr, and this gal would have walked away.

> The one adult behind the whole thing, the wife of the victim, the woman who

swore before God to love, honor, and obey her husband for the rest of her life would have walked away.

And the fact of the matter is that she didn't walk away because she is in court, *because she hasn't come forward and given truthful testimony.* The fact of the matter is that she is the most responsible of them all.

This comment was error. The fact that Ms. Dees gave a statement to the police did not entitle the prosecutor to comment on her decision not to testify at trial.

Defense counsel did not object to this statement at the time it was made; nor did he do so at a later time before submission to the jury. He did not ask the trial judge to instruct the jury to disregard the reference to Ms. Dees' failure to testify, and the trial judge did not offer such an instruction *sua sponte.* He did not move for a mistrial and the trial court did not declare one *sua sponte.*

### 2. *The Prosecutor's Comment Was An Improper and Direct Comment on Defendant's Failure to Testify.*

The State argues that because Defendant recognizes that the prosecutor's comment on Ms. Dees' failure to testify was inadvertent rather than intentional and because it occurred in the context of an argument intended to address her failure to give truthful statements to the police, we should not find that it constitutes a comment on her failure to testify at all.

■ We disagree. Whether or not the comment was intentional does not change the fact that it constituted a direct reference to defendant's failure to testify. A direct reference to a defendant's failure to testify is made when the prosecutor's reference is definite and certain, such as by the use of the words "defendant," "accused," and "testify" or their equivalent. *State v. Lawhorn,* 762 S.W.2d 820, 826 (Mo. banc 1988); *State v. Robinson,* 641 S.W.2d 423, 426 (Mo. banc

1982); *State v. Laws,* 854 S.W.2d 633, 636 (Mo.App.1993). That is exactly what occurred here.[2]

Here, however, defense counsel failed to object to the prosecutor's comment, and thus has failed to preserve this error for appeal. Ms. Dees argues on appeal that we nonetheless should consider this question as a matter of plain error.

■ As a general rule, plain error review is used sparingly. It provides a basis for reversal only when the defendant goes beyond a showing of demonstrable prejudice to establish manifest prejudice affecting substantial rights. This is normally accomplished only upon a showing by the defendant that the improper comment had a decisive effect on the jury's verdict. *State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993).

■ It is particularly difficult to obtain relief based on an assertion of plain error concerning closing argument, such as is made here. This is because trial strategy looms as an important consideration in determining when and whether to object in closing argument. *State v. Cobb,* 875 S.W.2d 533, 537 (Mo. banc), *cert. denied,* — U.S. —, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994). For this reason, in the absence of a timely objection and request for relief, the trial court's options in the face of improper argument are narrowed to uninvited interference with summation and a corresponding increase in the risk of error by such intervention. *State v. Parker,* 886 S.W.2d 908, 927 (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

■ On the other hand, if objection is made, the trial court has the option of considering whether any prejudice can be cured by sustaining the objection and, if so requested and in more serious cases, by instructing the jury to disregard the comment. *State v. Nolen,* 872 S.W.2d 660, 662 (Mo.App.1994).

---

**2.** By contrast, an indirect reference is one that is reasonably apt to direct the jury's attention to an accused's failure to testify. *Lawhorn,* 762 S.W.2d at 826. While *Lawhorn* held that an indirect reference is improper only if there is a

calculated intent demonstrated by the prosecutor to magnify that decision so as to call it to the jury's attention, such proof of improper intent is not necessary where, as here, the comment is a direct one as to defendant's failure to testify.

Ms. Dees argues that this rule does not apply where, as here, the improper comment constituted a direct comment on the defendant's failure to testify. She alleges that such an error is so serious that it cannot be cured by an instruction below, and that the only remedy which will avoid manifest injustice is to grant a mistrial.

In support, Ms. Dees cites to a number of cases decided prior to 1992 which held that, even in the absence of objection, a new trial was required where the prosecutor directly commented on the failure of the defendant to testify. For instance, *State v. Reed,* 583 S.W.2d 531 (Mo.App.1979), reversed for a new trial because the prosecutor improperly directly commented on the accused's failure to testify. In so doing it held:

> References to the accused's failure to testify, however, which were not objected to at trial or alleged as error in a motion for new trial have been regarded as justifying the invocation of the plain error rule when such references deprived the accused of his right to a fair trial. We are of the opinion that the prosecutor's remarks infringed upon the appellant's right against self-incrimination, and warrant our review pursuant to the plain error doctrine....

*Id.* at 533 (citations omitted). *Accord State v. Cockrum,* 592 S.W.2d 300, 302 (Mo.App. 1979). Further, various courts had specifically held that "[r]emedial instructions, even if offered, do not cure the error of such direct references to the accused's failure to testify." *City of Cape Girardeau v. Jones,* 725 S.W.2d 904, 907–08 (Mo.App.1987). This is because "[i]n some instances, ... the making of improper statements injects poison and prejudice into the case which may not be neutralized and it is therefore appropriate to grant relief even though the error may not have been preserved for appellate review." *State v. Burnfin,* 771 S.W.2d 908, 912 (Mo. App.1989).

As the State notes in its brief, however, the Missouri Supreme Court's decision in *State v. Kempker,* 824 S.W.2d 909 (Mo banc 1992), "marked a significant departure from prior decisions, which frequently granted 'plain error' relief based upon unobjected-to comments on the accused's failure to testify."

In contrast to those cases, *Kempker* found no plain error despite the fact that the prosecutor had clearly directly commented on the defendant's failure to testify, stating:

> We conclude, nonetheless, that the absence of an objection is fatal to the defendant's contention. Had objection been made the trial judge could have taken appropriate steps to make correction. The defendant was not necessarily entitled to a mistrial. The judge could consider the state of the evidence and the apparent effect on the jury and might conclude that it would be sufficient to sustain the objection and then caution the jury if requested. Defense counsel did not give him this chance.

*Kempker,* 824 S.W.2d at 911.

■ As we understand *Kempker,* the Supreme Court is saying that in most cases even a direct comment on defendant's failure to testify, although erroneous, is not enough to justify a finding of plain error. The Supreme Court believes that the prejudice from such comments can normally be cured by an instruction to the jury. By failing to object, the defendant denied the judge the opportunity to avoid prejudice by means of an instruction and thereby waived his or her right to raise this issue as error on appeal. *See also State v. Dewey,* 869 S.W.2d 834, 838 (Mo.App.1994) (accord).

*Kempker*'s ruling is consistent with the United States Supreme Court's holding in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22, 87 S.Ct. at 827.

Of course, *Chapman* recognized that some types of constitutional errors, including the extreme comments on the failure of the defendant to testify at issue in *Chapman* itself, are not harmless. In *Chapman,* the judge had actually instructed the jury, and the prosecutor argued, in accordance with a California rule, that it should take the accused's

silence into consideration in reaching its decision as to his guilt or innocence. *Id.*, 386 U.S. at 19–20, 87 S.Ct. at 825–26. We are confident that *Kempker* does not hold otherwise.

Here, however, the prosecutor's comment was very brief and was in the context of a series of remarks directed toward the failure of defendant to offer a complete statement to the police. The prosecutor made no further reference to the failure to testify and no other improper comments were made in closing argument. Moreover, the comment appears to have been inadvertent and was not intended to unfairly prejudice the defendant. Finally, the trial court, at the request of the defense, submitted MAI–CR 3d No. 308.14 to the jury. That instruction told the jury it could not draw an adverse inference from Ms. Dees' failure to testify. In light of these facts, and in the face of the other evidence against Ms. Dees, we cannot say that manifest injustice occurred as a result of the prosecutor's single misstatement during closing argument. Point I is denied.

### b. *Instruction No. 9 Was Not Prejudicially Erroneous*

In her second point on appeal, Ms. Dees argues that Instruction No. 9, the verdict-directing instruction on murder in the first degree, erroneously failed to submit all elements of that crime. Instruction No. 9 states as follows:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about March 22, 1992, in the County of Clay, State of Missouri, Jonathan Lair caused the death of Ronald Dees by shooting him, and

Second, that it was Jonathan Lair's purpose to cause the death of Ronald Dees, and

Third, that Jonathan Lair did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, and

Fourth, that Jonathan Lair did not act in lawful defense of another person as submitted in Instruction No. 13

then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the death of Ronald Dees, the defendant aided or encouraged Richard Waring or Jonathan Lair in causing the death of Ronald Dees and reflected upon this matter cooly [sic] and fully,

then you will find the defendant guilty under Count I of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

If you do find the defendant guilty under Count I of murder in the first degree, you are to assess and declare the punishment at imprisonment for life without eligibility for probation or parole.

Ms. Dees argues that this instruction permitted her to be found guilty if the jury believed either: (1) that she directly aided or encouraged Mr. Lair to kill Mr. Dees, or (2) that she aided or encouraged Mr. Waring to kill Mr. Dees. Below, and in her initial brief on appeal, she claimed that this was error because the only basis on which she could be held guilty for aiding and encouraging Mr. Waring was if he was in fact the true killer. She points out that the evidence was undisputed that it was Mr. Lair, not Mr. Waring, who did the actual shooting. Thus, she argued, it was error to submit that she could be found guilty for aiding and encouraging Mr. Waring.

In fact, Ms. Dees submitted an instruction, refused by the trial court, in which Paragraph Fifth above was modified to read as follows:

Fifth, that with the purpose of promoting or furthering the death of Ronald Dees, the defendant aided or encouraged Jonathan Lair in causing the death of Ronald Dees and reflected upon the matter coolly and fully, ...

The trial court properly refused this instruction and gave the one offered by the

prosecution instead. Ms. Dees' proposed instruction would have permitted her to be found guilty only if the jury found that she directly aided or encouraged Mr. Lair to commit the murder. While, as discussed *infra,* we believe the evidence fully supported that submission, that was not the only basis on which the evidence supported a finding of Ms. Dees' guilt. To the contrary, Missouri law provides that:

> A person is criminally responsible for the conduct of another when ... [e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in *planning, committing or attempting to* commit the offense.

§ 562.041.1(2), RSMo 1986. Thus, if the jury found, based on the evidence, that Ms. Dees aided and encouraged Mr. Waring in his hiring of Mr. Lair to commit the murder, it could find her guilty of murder.

This is exactly what the instructions permitted. In addition to Instruction No. 9, the jury was given Instruction No. 8. The latter paraphrased Section 562.041.1 as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

When Instruction No. 9 is read in conjunction with Instruction No. 8 and considered in light of the evidence and the arguments of counsel, it is clear from the record that the jury was aware that it could not convict Ms. Dees of first degree murder unless she actively participated in her husband's murder by either: (1) directly aiding or encouraging Mr. Lair, the actual killer, to kill her husband, or (2) directly aiding or encouraging Mr. Waring, her boyfriend, to hire someone to kill her husband, even if she was not directly involved in hiring or recruiting the actual killer.

█ In her Reply brief, Ms. Dees modified her argument considerably. She argued that the Instruction was erroneous because it permitted her to be found guilty for aiding Mr. Waring without requiring the jury to also find that Mr. Waring hired Mr. Lair to do that killing.

Were this a contested issue at trial, and had it been properly preserved at trial and in defendant's initial brief, we would agree that it should have been included in the instruction. As Ms. Dees notes, the Notes on Use for MAI–CR 3d No. 304.04 provided, at the time of trial, that "[c]are must be taken in those cases where the liability of the defendant is based solely on his being criminally responsible for the conduct of another that the verdict director requires the finding of the commission of the crime by the other person."

█ However, it was undisputed below that Mr. Lair was recruited by Mr. Waring *to murder Mr. Dees.* It also was undisputed that Mr. Lair had no grudge against Mr. Dees and shot Mr. Dees three times in the head with his own .22–caliber pistol solely because Mr. Waring promised him $6,000 to do so. Where, as here, an issue is undisputed, it is not manifest injustice to fail to submit it. *See State v. Walton,* 703 S.W.2d 540, 542 (Mo.App.1985). Point II is denied.

### c. *The Evidence was Sufficient to Support Ms. Dees' Conviction*

█ Ms. Dees also argues that there was insufficient evidence to support her conviction. Review of a challenge to the sufficiency of the evidence to support a criminal conviction is limited to a determination whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). Substantial evidence is that from which the trier of fact could reasonably find the issue in harmony with the verdict. *State v. Gomez,* 863 S.W.2d 652, 655 (Mo.App.1993).

█ Ms. Dees argues that she could not have been found guilty of murder in the first degree and armed criminal action as the result of the shooting death of her husband

unless she "directly discussed the killing of Mr. Dees with Jonathan Lair", the actual killer. As just discussed, this is incorrect. Ms. Dees need not have personally performed each act constituting an element of the crimes with which she was charged to be criminally responsible for conduct of Mr. Waring or Mr. Lair in killing Mr. Dees. *State v. Howard,* 896 S.W.2d 471, 494 (Mo. App.1995). Rather, proof of another form of participation in the crime set out in Section 562.041.1 was sufficient to support Ms. Dees' conviction. *Id.* Here, the State met its burden by showing that Ms. Dees associated with and encouraged those involved in the crime before, during and after the commission of the crime. This included meetings or discussions with Mr. Waring, with whom Ms. Dees conspired to plan and carry out her husband's killing. Mr. Waring testified that he had a number of discussions with Ms. Dees regarding killing Mr. Dees. Furthermore, Ms. Dees admitted participating in at least two of these conversations and further stated that, at least during one such conversation, she did nothing to discourage Mr. Waring with regard to the plans to kill Mr. Dees. In addition, there was substantial evidence that Ms. Dees was present and participated in numerous conversations during which the killing of Mr. Dees was discussed. Mr. Waring also testified that he informed Ms. Dees of any conversations and agreements he made regarding killing Mr. Dees while she was not present and that she agreed with the decisions he made.

We further find that there was sufficient evidence to support the alternative submission that Ms. Dees directly aided and encouraged Mr. Lair to kill Mr. Dees. Ms. Dees was present during two meetings with Mr. Lair absent the plan to kill Mr. Dees. During one such conversation, Ms. Dees stood next to Mr. Waring while he spoke with Mr. Lair. Ms. Dees made no comment but would occasionally nod her head in agreement with the statements being made. At a meeting at the Dees' house, Mr. Lair indicated that he was having trouble making up his mind about killing Mr. Dees. In response, Ms. Dees told Mr. Lair that, if it helped him decide, he should know that Mr. Dees had again raped her the previous night.

Ms. Dees, however, claims that this evidence was inadequate because it only "came from Lair's testimony." She argues that his testimony is unreliable and thus insufficient to support the guilty verdicts. The reliability and credibility of a witness, however, are for the jury to decide. *State v. Sumowski,* 794 S.W.2d 643, 645 (Mo. banc 1990). The jurors may believe all, some or none of a witness' testimony in arriving at their verdict and any conflicts or inconsistencies in the testimony must be resolved by the jury. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). By finding Ms. Dees guilty of the crimes charged, the jury chose to believe Mr. Lair's testimony regarding Ms. Dees' involvement in the killing of Mr. Dees. Sufficient evidence supported that verdict.

### d. *The Admission of the Photos of Mr. Dees' Body Was Not Erroneous.*

Ms. Dees also alleges that the trial court erred in admitting into evidence certain photographs of Mr. Dees' dead body because the photographs were inflammatory and irrelevant.

The trial court is vested with broad discretion in the admission of photographs and its decision may be overturned only upon a showing that the trial court abused its discretion. *State v. McMillin,* 783 S.W.2d 82, 101 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Photographs of victims' bodies should not be admitted where their sole purpose is to arouse the emotions of the jury or to prejudice the defendant. *State v. Wood,* 596 S.W.2d 394, 403 (Mo. banc), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980).

Nonetheless, the Missouri Supreme Court stated in *State v. Feltrop,* 803 S.W.2d 1 (Mo. banc), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991), that photographs of the victim's body and wounds are admissible when they are relevant "to show the nature and condition of the body, the nature and condition of the wounds, to aid the jury in understanding the testimony of the medical examiner, to corroborate testimony of various state's witnesses, and to aid

the state in establishing an element in its case." *Id.* at 10–11. The Court further held that photographs are not irrelevant as being cumulative where they depict "different wounds and views of the body." *Id.* at 11. *See also State v. Murray,* 744 S.W.2d 762, 772 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

While the trial court would have been within its discretion in excluding some or all of the photographs objected to, they were sufficiently probative of the nature and condition of the body and wounds, and relevant to aiding the jury in understanding the testimony of various state's witnesses, so that the trial court did not err in admitting them. State's Exhibit No. 23 is a photograph of Mr. Dees' body at the scene of the crime after the paramedics had attempted some resuscitation. This photograph shows the condition of the body and assisted the jury in understanding the testimony of the witness who initially attempted to treat Mr. Dees.

State's Exhibit Nos. 40, 41, and 42 depict the different wounds that Mr. Dees sustained. Each photograph provides a different view and/or a view of different wounds. These photographs assisted the jury in understanding the nature and condition of the wounds and the testimony of Dr. Vescovo, who performed the autopsy, as he described Mr. Dees' wounds and cause of death.

Furthermore, these photographs were relevant to establish the elements of the crime. The jury was asked to decide whether defendant was guilty of murder in the first degree for aiding and abetting. To do so, the jury had to find that Jonathan Lair caused the death of Mr. Dees by shooting him and that it was Mr. Lair's purpose to cause Mr. Dees' death. The crime scene and autopsy photographs are relevant in establishing the cause of death and the intent of Jonathan Lair.

The trial court actions in following the rule set by *State v. Schneider,* 736 S.W.2d 392 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988), *State v. Lay,* 896 S.W.2d 693 (Mo.App.1995) and similar cases decided over the past 30 years was not an abuse of discretion.

## 3. POST–CONVICTION APPEAL

### a. Standard of Review.

■ Appellate review of the motion court's decision regarding ineffective assistance of counsel is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j). Such findings and conclusions are deemed clearly erroneous only if, after reviewing the entire record, this Court is left with the definite and firm impression that a mistake has been made. *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987).

■ To prove a claim of ineffective assistance of counsel, Ms. Dees was required to show by a preponderance of the evidence that her attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would have exhibited under similar circumstances. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987). There is a strong presumption that her counsel's conduct falls within the wide range of reasonable professional assistance and trial strategy. *State v. Harris,* 870 S.W.2d 798, 814 (Mo. banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994); *Bevly v. State,* 778 S.W.2d 297, 298 (Mo.App.1989).

■ If her counsel's conduct is found to be deficient, then Ms. Dees must additionally affirmatively prove that she was prejudiced as a result of her counsel's actions. *Strickland,* 466 U.S. at 693–94, 104 S.Ct. at 2067–68. As the Court of Appeals explained in *Bevly:*

> The fact that an error by counsel might have had some conceivable effect on the outcome is not sufficient. Rather, movant, when challenging a conviction, must show there is a reasonable probability that, absent the alleged error, the fact finder would have had a reasonable doubt respecting guilt.

*Bevly,* 778 S.W.2d at 298–99. The court must consider the totality of the evidence in determining whether a reasonable probability exists. *Id.* at 299.

b. *Ms. Dees Was Not Denied Effective Assistance of Counsel by the Failure to Present Her Testimony at Trial.*

 Ms. Dees alleges that she was "denied effective assistance of counsel ... when trial counsel failed to present her testimony at trial."

 In defending a client, trial counsel has the right to select the strategy best suited for the client's case and should use his or her best judgment in matters regarding trial strategy. *State v. Williamson,* 877 S.W.2d 258, 262 (Mo.App.1994); *State v. Anthony,* 881 S.W.2d 658, 661 (Mo.App.1994). Furthermore, a client is bound by any stipulations which give effect to the strategy decided by trial counsel. *State v. Johnson,* 829 S.W.2d 630 (Mo.App.1992). Thus, ineffective assistance of counsel claims relating to trial strategy generally do not provide a basis for post-conviction relief, even when reasonable strategy may prove unsuccessful. *Williamson,* 877 S.W.2d at 262; *Anthony,* 881 S.W.2d at 661.

 The decision whether the defendant should testify is often referred to as "the most difficult decision for a defendant and his counsel to make." *State v. Powell,* 798 S.W.2d 709, 718 (Mo. banc 1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). Although that decision rests solely with the defendant, *Murphy v. State,* 768 S.W.2d 171, 172 (Mo.App.1989), the defendant is entitled to reasonably competent advice. *State v. Graham,* 906 S.W.2d 771, 786 (Mo.App.1995).

 Generally, trial counsel's advice whether to testify is a matter of trial strategy which, barring exceptional circumstances, is not a ground for post-conviction relief. *State v. Silas,* 885 S.W.2d 716, 722 (Mo.App. 1994). Counsel's advice that a defendant not testify or counsel's attempt to dissuade his client from testifying, without more, do not constitute incompetence if it might be considered sound trial strategy. *Powell,* 798 S.W.2d at 718; *State v. Turner,* 623 S.W.2d 4, 12 (Mo. banc 1981), *cert. denied,* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982).

At trial, Ms. Dees testified, outside the presence of the jury, that she had decided not to testify after discussing this matter with her trial counsel. She and her trial counsel had discussed whether she would testify at trial on a number of occasions over the three or four months prior to the trial. Ms. Dees stated, however, that it was her decision whether to testify and that she had deferred to her counsel's judgment in that regard.

At the evidentiary hearing, Ms. Dees testified that, as soon as Dan Gralike and Kim Shaw became her defense attorneys, they discussed the issue whether she should testify at trial. Ms. Dees stated that she did as her attorney advised her, and although it was "against [her] better judgment not to testify," she acknowledged that she had the "final say-so." She stated that Mr. Gralike "had told [her] that he didn't want to put [her] through being questioned on the stand." She thought her testimony could have helped discredit the testimony of her co-defendants, but she did not know whether her testimony would have made a difference.

Mr. Gralike testified that the decision that Ms. Dees would not testify was an agreement that was reached among Ms. Dees, Mr. Gralike and Ms. Shaw during trial. At the time the decision was made, Ms. Dees, Mr. Gralike and Ms. Shaw spent a minimum of two hours discussing whether Ms. Dees should testify. Mr. Gralike believed that any chance for acquittal would have been significantly diminished had Ms. Dees testified.

Mr. Gralike stated that the decision that Ms. Dees not testify was a matter of trial strategy. He testified that the jury could easily have believed that Ms. Dees masterminded the actions that resulted in Mr. Dees' death, if the jury perceived, as he did, that Ms. Dees appeared to be smarter than both Mr. Waring and Mr. Lair. This was especially true in light of the overwhelming evidence of the relationship between Mr. Waring and Ms. Dees and significant evidence that Ms. Dees and Mr. Dees were not getting along. In addition, Mr. Gralike stated that Ms. Dees would have been asked a number of questions on cross-examination that she could not have answered reasonably or with any believability. He also stated that, if Ms.

Dees had testified, the State could have questioned Ms. Dees regarding any inquiries she may have made of her husband's employer regarding insurance. Mr. Gralike stated that this would have been "extremely devastating to any viable argument" he could have made in closing argument.

This evidence supports the motion court's ruling that the decision that Ms. Dees not testify at trial was reasonable trial strategy. Furthermore, Ms. Dees failed to show that her testimony would have made a difference in the outcome of the case. While she thought her testimony would have helped discredit the testimony of Mr. Lair and Mr. Waring, she was unable to state that her testimony would have resulted in her acquittal. Thus, Ms. Dees failed to show that, but for the incompetence of her attorney, she would have been acquitted.

### c. Ms. Dees Was Not Denied Effective Assistance of Counsel by the Failure to Call Her Daughter as a Witness

Ms. Dees also contends that trial counsel's decision not to call her 15–year–old daughter, Trisha Gottschall, as a witness was ineffective assistance of counsel. Trisha was not called as a witness at the Rule 29.15 hearing, however, so there is no direct evidence as to what, if anything, she would have testified to at trial. Mere conjecture or speculation about potential testimony is not sufficient to establish the required prejudice. *State v. Lewis*, 872 S.W.2d 653, 654 (Mo.App. 1994).

Even were this issue preserved, Ms. Dees has failed to show, as she must, that her counsel's failure to call Trisha was something other than reasonable trial strategy and that Trisha's testimony would have provided Ms. Dees with a viable defense. *State v. Carson*, 898 S.W.2d 555, 558 (Mo.App.1995).

Mr. Gralike testified that the decision that Trisha not testify was one of trial strategy reached jointly by himself, Ms. Dees and Ms. Shaw. Mr. Gralike asserted that Trisha's testimony could have been detrimental in that she was familiar with the environment in the Dees' home during the six month period before Mr. Dees was killed. Furthermore, Trisha had admitted to being aware of at least one of several discussions between Ms. Dees and others about killing Mr. Dees. These were all valid reasons why counsel could reasonably have determined not to call Trisha.

Finally, even if Trisha had been called, and even had she testified as Ms. Dees hoped she would testify, her testimony only would have discredited testimony that related to minor aspects of the case concerning whether Ms. Dees had purchased a wedding ring for Mr. Waring, whether the comment by Ms. Dees to Brian Keel may not have been made and that Ms. Dees, not her husband, had been wearing a certain diamond earring for several months prior to his death. As such, admission of this testimony would not have presented a viable defense and failure to call Trisha as a witness does not show ineffective assistance of counsel.

### d. Trial Counsel's Failure to File a Motion to Suppress and Failure to Object to the State's Prejudicial Statement in Closing Argument Were Not Preserved for Appellate Review.

Ms. Dees claims her counsel was ineffective based upon his failure to object to the assistant prosecutor's remark during closing argument that Ms. Dees "hasn't come forward and given truthful testimony." She also claims her counsel was ineffective because he failed to file a motion to suppress her statements to the police. However, she acknowledges in her appellate brief that neither of these instances of conduct were "specifically cited as ineffective assistance of counsel in the Rule 29.15 motion, and no evidence on the issue was adduced by either side at the 29.15 evidentiary hearing."

Claims that were not presented to the motion court are waived and cannot be raised for the first time on appeal. *Amrine v. State*, 785 S.W.2d 531, 535 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990); *Yoakum v. State*, 849 S.W.2d 685, 689 (Mo.App.1993). Because the appellate court lacks jurisdiction to consider these claims, *State v. Light*, 835 S.W.2d 933, 941 (Mo.App.1992), they are not eligible for plain error review under Rule 84.13(c).

*Keener v. State,* 790 S.W.2d 269, 270 (Mo. App.1990).

For the reasons stated above, we affirm Ms. Dees' conviction and affirm denial of her motion for post-conviction relief.

All concur.