**STATE of Missouri, Respondent,**

v.

**Brian STEWART, Appellant.**

**No. ED 75655.**

Missouri Court of Appeals,
Eastern District,
Division Seven.

March 28, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 10, 2000.

Application for Transfer Denied
June 27, 2000.

78

Joseph I. Murphy, St. Charles, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

1. HIV is the human immunodeficiency virus that causes acquired immunodeficiency syndrome (AIDS). *State v. Mahan,* 971 S.W.2d 307, 309 (Mo. banc 1998); Section 191.650(5), RSMo 1994. AIDS is a viral disease that weakens and then destroys the body's immune system, which leads to death.

RICHARD B. TEITELMAN, Judge.

Brian T. Stewart (hereinafter, "Defendant") appeals from a judgment entered pursuant to his jury conviction for the class A felony of assault in the first degree, Section 565.050, RSMo 1994, obtained in the Circuit Court of St. Charles County. Defendant was sentenced to life imprisonment. We affirm.

*Background*

Defendant was charged by information with assault in the first degree for attempting to kill or cause serious physical injury and by actually inflicting serious physical injury to his biological son, B.S.J., by infecting him with the Human Immunodeficiency Virus ("HIV").[1]

The sufficiency of the evidence to support Defendant's conviction is in dispute. On review, we accept as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). Viewed in the light most favorable to the verdict, the following evidence was adduced:

Defendant was a phlebotomist at Barnes–Jewish Hospital in St. Louis. His duties there were to collect blood from patients. He often brought tourniquets, syringes and needles home from work. He frequently kept such supplies in his lab coat. He also brought home vials of blood. He made threats that he could take things from the lab where he worked, infect people, and that they would never know what they had or how they got it. He said that he had the power to wreck people's lives if they "messed with him." He had access to

*State ex rel. Callahan v. Kinder,* 879 S.W.2d 677, 679 (Mo.App. W.D.1994) (citing *Doe v. Barrington,* 729 F.Supp. 376, 380 (D.N.J. 1990)). HIV is acquired through contact with the blood, semen or vaginal fluid of an infected person. *Id.*

blood that was infected with the HIV virus.

In May of 1990, he began a relationship with the victim's mother (hereinafter, "Mother") and lived with her from time to time. In July of 1990, Mother found out that she was pregnant with Defendant's child. When she told this to Defendant, that same month, he became very angry. He claimed that the child could not be his because he could not have children. In December of 1990, Defendant and Mother went to a hotel together. Defendant took a tourniquet, syringe, and needle out of his bag and said that he was going to kill himself. Mother begged him not to do it, and Defendant said that if she did not leave him alone he would kill her by injecting her with air. However, Defendant did not harm either himself or Mother at that time.

The victim, B.S.J., was born on February 24, 1991. Defendant first saw B.S.J. three months later. At that time, Defendant did not display affection for B.S.J. and told Mother that she needed to have paternity tests in order to prove that he was the father.

In May, June and July of 1991, the victim was examined as part of an infant vaccination study. These exams revealed that he was a healthy child who was not infected with HIV. However, subsequent exams revealed that the victim had asthma.

On February 2, 1992, Mother brought B.S.J., who was eleven months old, to St. Joseph's Hospital West in St. Charles County because his asthma had worsened. Mother called Barnes–Jewish Hospital and left a message for Defendant that indicated that the victim had been hospitalized. The victim's room contained a bed for his mother, and she stayed with him in the hospital.

On February 6, 1992, the victim's doctor determined that his condition had improved so that he could be released from the hospital. Before he was released, however, Defendant unexpectedly arrived at the hospital with his lab coat, which had deep pockets for carrying supplies.[2] Defendant placed his lab coat over a rocking chair.

Defendant asked Mother when the victim was going to have some stitches from a previous injury removed from his head. Mother said they would be removed before the victim went home that day. Defendant said that the victim's face was going to be scarred and imperfect and that the victim was not worth having.

Mother left Defendant in the room with the victim when she went to the cafeteria to get something to drink. When she returned to the victim's room about twenty minutes later, the victim was sitting on Defendant's lap crying hysterically. Defendant's lab coat had been moved while Mother had been gone from the room.

Mother was concerned for the victim and called for nurses. The nurses were not able to diagnose what was wrong with the victim. Defendant moved near the door as the nurses examined the victim, then said that he had to go to work and left. The victim became exhausted and fell asleep. However, he continued to exhibit a difficulty in breathing, a fever, and a fast heart rate. This sudden change in his condition was consistent with him receiving an injection of incompatible blood (a hemolytic reaction).[3] The victim was transferred to Cardinal Glennon Children's Hospital instead of being sent home and remained at the Children's Hospital for

---

2. Defendant told Mother that he had brought his lab coat with him because he did not want it to be stolen out of his vehicle.

3. No reason for the victim's sudden change of condition was discerned at that time. The trial testimony of Dr. Linda Steele–Greene, the victim's physician, established that the victim's symptoms were consistent with a hemolytic reaction.

four days. Defendant never again visited the victim in the hospital.

Testimony at trial established that an injection could best be hidden through a prior injection site or the site of an intravenous line. The victim had an intravenous line during his stay at the hospital that had been removed from his hand before Defendant's visit.

In August of 1992, Mother ended her relationship with Defendant. She called him at work to ask him for financial support for the victim because she did not know his home phone number or address. Defendant argued that he was not the victim's father and that he had no financial responsibility. He said that paternity had not been legally established. Defendant said, "I told you that when I leave, I'm going to leave for good and I'm not going to leave any loose ends or ties behind." Defendant said, "you won't need to look me up for child support anyway because your child is not going to live that long." Mother asked what Defendant meant by that and he replied, "don't worry about it. I just know that he is not going to live to see the age of five." Defendant said that if Mother tried to find him he could have her taken care of and that nobody would be able to trace it back to him.

Steven Zegar, a member of Defendant's Illinois National Guard Unit, testified that Defendant told him that if someone "messed with" Defendant, he would inject them with something and that they would never know what hit them.

Mother filed a paternity suit in 1993, but could not locate Defendant. Defendant moved several times in an attempt to avoid being located by Mother. He also used different names and social security numbers.

In April of 1996, the victim began having persistent fevers, vomiting, weight loss, lethargy and leg pains, and also had a low lymphocyte count. The victim tested positive for infectious mononucleosis. He had not been tested for AIDS, because his doctors did not believe that he was at risk of receiving that disease. However, on May 23, 1996, Dr. Linda Steele–Green, the victim's physician, realized that Defendant had access to blood and that he had stated that the victim would not live long. Accordingly, she asked for the victim to be tested for AIDS.

On May 24, 1996, the victim was tested and diagnosed with AIDS, which was in a very advanced state. The victim's condition was consistent with his being infected with HIV in February of 1992. It was believed that he would die within six months; however, subsequent treatment has improved his condition.

Since the victim was diagnosed with AIDS, Defendant has not visited the victim or called regarding his welfare. Defendant told a woman he was living with that someone was trying to claim that a child was his, but the child was not his. In July of 1996, he told her that the child tested positive for AIDS, but that he tested negative. He said that even if the child was his, he would not pay child support, and that the child would be dead soon.

The victim was checked for evidence of sexual abuse, but none was found. During the investigation of the victim's infection with AIDS, individuals who had contact with the victim were tested for HIV and the results of all of their tests were negative. The investigation showed that there was no risk that the victim was infected with HIV by normal means.

Defendant did not testify at trial on his own behalf. After hearing the evidence, the jury found Defendant guilty as charged. Defendant was sentenced to life imprisonment.

On appeal, Defendant raises seven claims of error. He argues that the trial court (1) plainly erred in not declaring a mistrial when the prosecuting attorney in closing argument referred to the fact that Defendant had not testified; (2) erred in not excluding all references to Defendant's character and any references to Defen-

dant's propensity to commit criminal acts; (3) erred in admitting Exhibit 39, a blood test result of B.S.J. taken in 1991; (4) erred in giving a Hammer instruction after agreeing that the jury could choose whether to continue or recess for the weekend; (5) erred in denying Defendant's request for discovery of exculpatory evidence; (6) erred in permitting the State to pit the Defendant's right to a speedy trial against his right to full and timely discovery of exculpatory evidence; and (7) erred in denying Defendant's motions for judgment of acquittal and his motion for new trial.

## I

■ In Defendant's first point on appeal he claims that the trial court erred in failing to declare a mistrial, *sua sponte*, during the State's closing argument because the prosecutor's remarks were a direct reference to the defendant's failure to testify.

■ The State may not comment on a defendant's failure to testify through a direct and certain reference or an indirect and certain reference. *State v. Campbell*, 965 S.W.2d 878, 881 (Mo.App. E.D.1998). In the case at bar, the prosecuting attorney stated during closing argument: "the question we get to and why we spent the four days is how do we know the defendant did it, and that is why I anticipated you would hear from the defendant himself." This was a blatant and inappropriate direct reference to Defendant's failure to testify.

■ However, Defendant did not object at the time of the argument and thus has failed to preserve this claim of error for appeal. *See State v. Parker*, 886 S.W.2d 908, 922–923 (Mo. banc 1994), *cert. denied* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). He now requests plain error review pursuant to Rule 30.20. Defendant is only entitled to relief under a plain error standard of review if the error substantially affected his rights and a manifest injustice or miscarriage of justice

would result if uncorrected. *State v. West*, 849 S.W.2d 671, 674 (Mo.App. E.D.1993).

■ The plain error rule is to be used sparingly and does not justify review of every trial error that has not been properly preserved for review. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). "Relief should be rarely granted on assertion of *plain error* to matters contained in closing argument, for trial strategy looms as an important consideration and such assertions are generally denied without explication." *State v. Clay*, 975 S.W.2d 121, 134 (Mo. banc 1998), *cert. denied* 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999) (citations omitted).

■ It is particularly difficult to obtain relief based on an assertion of plain error concerning closing argument, because the failure to object during closing argument is more likely a function of trial strategy than of error. *State v. Cobb*, 875 S.W.2d 533, 537 (Mo.banc 1994), *cert. denied*, 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994); *State v. Boyd*, 844 S.W.2d 524, 529 (Mo.App. E.D.1992). Without a timely objection and request for relief, the trial court's options in the face of improper argument are narrowed to uninvited interference with summation and a corresponding increase in the risk of error by such intervention. *State v. Dees*, 916 S.W.2d 287, 295 (Mo.App. W.D.1995). Conversely, if objection is made, the trial court has the option of considering whether the defendant was prejudiced and whether the prejudice can be cured. *Id.* Therefore, to be entitled to relief under plain error review Defendant must establish that the improper argument had a decisive effect on the jury by showing that, "in absence of these comments, the verdict would have been different." *State v. Sloan*, 998 S.W.2d 142, 146 (Mo.App. E.D. 1999), citing *State v. Roberts*, 838 S.W.2d 126, 132 (Mo.App. E.D.1992). Defendant has failed to demonstrate that, absent the improper reference, the verdict would have been different. Therefore, we do not believe the claim of error in the case at bar

establishes a manifest injustice or an exceptional circumstance. Point denied.

## II

In Point II, Defendant argues that the trial court erred in failing to exclude all references to Defendant's character and any references to his propensity to commit criminal acts especially in light of Defendant's motion in limine to exclude character evidence and uncharged bad acts. He contends that the introduction of such evidence violated his right to a fair trial and due process of law. Defendant's motion in limine to exclude character evidence and uncharged bad acts was granted prior to trial and the State executed an agreement to exclude Defendant's character and any reference to uncharged criminal acts. However, during the trial, the State elicited testimony from several individuals that Defendant now argues was improper character evidence or uncharged bad acts.

Evidence of prior uncharged crimes, wrongs, or bad acts is not admissible to show that the defendant has a propensity to commit such crimes. *State v. Clover*, 924 S.W.2d 853, 855 (Mo. banc 1996). Such evidence is admissible, however, if it is both logically relevant, meaning that it has a legitimate tendency to directly establish the defendant's guilt of the crime charged, and legally relevant, meaning that the probative value of the evidence outweighs its prejudicial effect. *Id.; State v. Collins*, 962 S.W.2d 421, 424 (Mo.App. W.D.1998). Evidence is logically relevant if it tends to establish motive, intent, absence of mistake or accident, a common plan or scheme, or identity. *Id.* "Admission of evidence such as this 'is within the trial court's discretion because the trial court is in the best position to evaluate whether the potential prejudice of relevant evidence outweighs its relevance.'" *State v. Andrich*, 943 S.W.2d 841, 844 (Mo.App. E.D.1997), citing *State v. Patterson*, 847 S.W.2d 935, 938 (Mo.App. E.D.1993).

However, a ruling on a motion in limine is not generally appealable. *State v. Jordan*, 978 S.W.2d 36, 39 (Mo. App. E.D.1998). A trial court's ruling granting a motion in limine is interlocutory only and subject to change during the course of trial. *State v. Boyd*, 992 S.W.2d 213, 218 (Mo.App. E.D.1999). Therefore, such a ruling, in and of itself, preserves nothing for appeal. *Id.* Defendant was required to object during trial upon the admission of evidence in order to preserve his argument on appeal. The alleged improper admissions of evidence not objected to at trial are reviewable only for plain error. *State v. Collins*, 962 S.W.2d at 423.

Defendant argues that character evidence was improperly admitted at trial. We will discuss each type of evidence in turn.

### (1) *Defendant Took Property From Mother*

Defendant argues that the trial court erred when it overruled his relevancy objection to the prosecutor's question to Mother regarding whether, after Defendant visited her in January of 1992, she noticed anything missing. This visit occurred approximately a month before he infected the victim with HIV. Mother had told Defendant that she wanted to end the relationship, but Defendant on this visit told her that he wanted the relationship to continue. Instead, however, he left early the next morning and Mother later noticed that a $20 bill was missing from her purse and that a leather jacket that Defendant had given her for Christmas was missing.

The State argues that this evidence was relevant to demonstrate Defendant's animus toward Mother, which was part of the motive the State sought to establish at trial. *State v. Adkins*, 867 S.W.2d 262, 264 (Mo.App. E.D.1993); *State v. Jacobs*, 939 S.W.2d 7, 10 (Mo.App. W.D.1997). We disagree.

Evidence that Defendant had stolen money and a jacket from Mother

was not relevant to demonstrate his motive to harm the victim. However, to warrant reversal, improperly admitted evidence must have resulted in prejudice to the defendant. *State v. Collins,* 962 S.W.2d 421, 424 (Mo.App. W.D.1998). "[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different." *State v. Nastasio,* 957 S.W.2d 454, 459 (Mo.App. W.D.1997). Defendant has not demonstrated a reasonable probability that the outcome of his trial would have been different if the evidence regarding the items he appropriated from Mother had been excluded.

### (2) *Defendant Previously Threatened Mother and the Victim*

■ Defendant argues that the trial court erred when it permitted the prosecutor to elicit, without any defense objection, (1) testimony from Mother that in December of 1990, while Mother was pregnant with the victim, Defendant threatened to kill her with a syringe, and (2) that Defendant threatened to hurt the victim when the victim was nine months old; and (3) testimony from the State's witness Debra Barger that she had heard Defendant make threats against Mother and was asked whether she had ever seen bruises on Mother.

■ Evidence of prior bad acts is generally inadmissible because criminal defendants can only be tried for the offense for which they are charged. *State v. Andrich,* 943 S.W.2d at 844. However, when evidence of prior acts tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or identity, it is admissible. *Id.* In this case, the evidence of prior threats against Mother and the victim demonstrate Defendant's intent to inflict injury on the victim. This evidence was relevant because it showed Defendant's motive to harm the victim. Further, the trial court

sustained the defense counsel's relevancy objection to the prosecutor asking Barger whether she noticed any bruising on Mother. Defendant received all the relief he requested and cannot now claim error. *State v. White,* 835 S.W.2d 942, 952 (Mo. App. E.D.1992).

### (3) *Defendant Used Aliases and Different Social Security Numbers*

■ The Honorable Frank Conard, Circuit Judge of St. Charles County, testified that Defendant had used two different social security numbers, and that such a practice would make it difficult to check his income. Deborah Schindler, an employee of the St. Louis City Health Department, testified that Defendant used other names including Thomas Stewart Simonin.

■ The "common scheme or plan" exception to the rule against admission of character evidence or uncharged acts most often applies when the evidence tends to show that the uncharged misconduct proceeds from a single plan formed in advance of both acts. *State v. Roberts,* 948 S.W.2d 577, 591 (Mo. banc 1997). This evidence supported the State's theory that Defendant's motivation for infecting the victim was to avoid paying child support. It demonstrated that Defendant was attempting to hide his income and his identity. Such actions are evidence of a common scheme or plan to avoid paying child support.

### (4) *Defendant Threatened to Harm Himself With a Syringe*

■ During Mother's testimony, the prosecutor elicited evidence that in December of 1990, Defendant threatened to kill himself with a syringe. Defense counsel did not object to this testimony. Therefore, it is not preserved for review. We decline to review it for plain error.

### (5) *Defendant's Manner of Dress at Work*

 Mother testified that Defendant liked to wear a lab coat to work so that he looked like a doctor. Defendant's supervisor at Barnes–Jewish Hospital, Dolores Johnson, testified over Defendant's objection that Defendant dressed unusually well for a phlebotomist. The court sustained his hearsay objection to testimony that Johnson heard concerns that Defendant was attempting to impersonate a doctor and instructed the jury to disregard that testimony.

 Evidence that Defendant liked to wear a lab coat is not evidence of another crime and evidence that Defendant wore good clothes is not a bad act. Furthermore, this evidence was relevant to demonstrate that Defendant could get access to areas of the hospital where tainted blood might be contained. Therefore, the admission of this evidence was not erroneous.

### (6) *Testimony of Officer Kevin Wilson*

 Officer Kevin Wilson of the St. Charles Sheriff's Department testified that Defendant's ex-wife, Elizabeth Stolte, told him that Defendant took her to places in Barnes–Jewish Hospital where she knew they weren't allowed to go during their mutual employment there. These places included laboratories that were closed offices. Defendant didn't object to this testimony, but did object on the ground of invading the province of the jury to a question about why this was important to Officer Wilson's investigation.

. This evidence was relevant to show that Defendant had access to areas in the hospital where he could acquire HIV-tainted blood.

### (7) *Defendant Became Angry When Mother Approached Him at Work*

 Mother testified, without any relevancy objection from Defendant, that Defendant became angry when Mother and the victim arrived at Barnes–Jewish Hospital while he was working there to talk to him about his financial responsibility for the victim. Mother testified that Defendant had pushed her and the victim to the side while he was talking with them and rushed them out of the hospital as quickly as possible.

The evidence was relevant to demonstrate Defendant's motive to avoid paying child support and to keep Mother and the victim out of his life.

Delores Johnson, Defendant's supervisor, was present during the incident and testified at trial. When the prosecutor asked Johnson what she had observed on that date, defense counsel objected on the ground that this was evidence of other bad acts. The trial court sustained the objection.

At no time did counsel request a curative instruction or mistrial. Defendant received the relief he requested and cannot now claim error. *State v. White*, 835 S.W.2d at 952.

### (8) *Defendant Saved Vials of Blood in Mother's Freezer*

 Defendant argues that the trial court erred when it permitted the prosecutor to elicit, without any objection at trial from Defendant, testimony from Mother that Defendant was saving vials of blood in her freezer and that he claimed that the blood was his.

This evidence was relevant to demonstrate that Defendant had access to blood and that he could bring it home from work. It was therefore evidence of Defendant's ability to commit the charged offense.

### (9) *Defendant's Lack of Interest in the Victim*

 Defendant argues that the trial court erred in overruling his relevancy objection to testimony that Defendant never called the victim on the victim's birthday. He also argues that the trial court erroneously allowed the prosecutor to elicit,

without any objection from Defendant, evidence that Defendant never called the victim on holidays, that Defendant never called the victim as to his welfare, and that Defendant never made arrangements to see the victim. Further, he claims that the court erred when it overruled his objection to the testimony of the victim's aunt that she never saw Defendant exhibit any affection towards the victim.

This evidence was relevant and admissible to demonstrate one of Defendant's motives for infecting the victim with HIV, specifically, that he did not care for the victim.

#### (10) *Testimony of Defendant's Ex-wife*

The State presented evidence that Defendant took evasive measures to avoid being located by Mother when she tried to bring a paternity suit against him. Some of this evidence was presented through the testimony of Defendant's ex-wife, Elizabeth Stolte. Stolte further testified on redirect examination that Defendant had beaten and threatened her. Defendant now argues that Stolte's testimony on these matters was improperly admitted

a.

■ Stolte testified that in November of 1994 Defendant planned to move with her to San Antonio, Texas. However, Stolte learned that he intended to leave her behind in San Antonio after they moved. Accordingly, Stolte ended their relationship. When Stolte testified to these facts, Defendant objected, but the objection was untimely and was overruled.

Stolte also testified that Defendant told her that Barnes Hospital had accused him of "messing up specimens and stuff."[4] Stolte testified that she did not know whether Defendant quit his job at Barnes

or what happened, but he soon began working at Jewish Hospital instead.

This and other evidence was adduced to demonstrate that Defendant frequently changed residences with Stolte and also changed jobs to avoid being found by Mother so that she could not pursue a paternity action against him and he could avoid paying child support for the victim. Leaving Stolte in San Antonio was part of this plan to make it difficult for him to be located. It was also evidence that Defendant was cutting ties to the St. Louis area so that he could be farther away from the victim and more difficult to locate.

b.

■ On redirect examination, Stolte testified, without an objection from Defendant, that she got an order of protection against Defendant because he beat her and threatened her. When the actual order of protection was offered into evidence, Defendant's counsel agreed that it should be admitted.

Defendant opened the door to this line of questioning during cross-examination of Stolte when he asked her whether Defendant had ever threatened her and acted on his threats. Stolte responded that he had threatened her and was abusive to her when they were married. It was permissible for the prosecutor to have Stolte explain the testimony that she gave on cross-examination. *See State v. Petty*, 967 S.W.2d 127, 142 (Mo.App. E.D.1998).

#### (12) *Question to Victim's Grandmother Regarding Defendant's Treatment of Mother*

■ The prosecutor asked the victim's grandmother how Defendant treated Mother. Defendant objected to this question and the prosecutor withdrew it. Defendant did not request additional relief.

---

**4.** Defendant did not raise a relevance objection at trial. Defendant objected on the ground that the evidence was "hearsay and stuff." However, the statement regarding people at Barnes Hospital accusing him of messing up specimens was not offered for the truth of the matter asserted. Rather, Stolte repeated a statement made by Defendant and testified that she didn't know why Defendant no longer worked at the hospital.

Having received the relief that he requested, if Defendant required a different remedy, it was up to him to request that relief from the trial court. *State v. White*, 782 S.W.2d 461, 465 (Mo.App. W.D.1990). Having failed to do so, he cannot claim error on appeal. *State v. Atchison*, 950 S.W.2d 649, 653 (Mo.App. S.D.1997).

(13) *Defendant's Misconduct at Work*

■ Defendant argues that the trial court erred when it overruled his objections and allowed one of his supervisors at Barnes–Jewish Hospital, Edith Webb, to testify that Defendant was reprimanded for not answering his beeper at appropriate times and for not turning in blood samples that he had drawn, and that Defendant would show up at the hospital when he was not scheduled to work.

This evidence was relevant and admissible to show that Defendant had the ability to get blood for his own uses. It demonstrated that he was not always doing hospital business while he was there, that he went to the hospital when he had no hospital business, and that blood samples he had taken sometimes disappeared.

(12) *Defendant's Demeanor
When Speaking to Health
Department Personnel*

■ During the trial, the State introduced the testimony of St. Louis Health Department personnel concerning their interactions with Defendant during the course of their investigation of the victim's infection. Lee Ferchard testified, over defense objection, that Defendant did not want anyone to know that he was in the sexually transmitted diseases clinic. Freda Weaver testified, also over defense objection, that when she met with Defendant in July of 1996 he was angry because he thought his parents were being harassed and that the Health Department personnel were using confidential information when trying to locate him.

The fact that Defendant wanted to keep his visit to a confidential clinic private is not evidence of an unrelated bad act or an uncharged crime. Neither is evidence that Defendant disapproved of the methods employed by the Health Department in procuring information about him. The State argues that this evidence was relevant to provide a complete and coherent picture of the manner in which Defendant learned of the investigation that was pending and it put his incriminating statements into context.

The admission of these facts, whether or not relevant, was not prejudicial to Defendant.

(14) *Evidence That Defendant
Threatened the Victim's
Aunt*

■ Defendant argues that the trial court erred by allowing, without any defense objection, the prosecutor to adduce testimony from the victim's aunt, Veronica Kuda, that Defendant once told her that he was "trained to kill" so she shouldn't "mess with" him. Since there was no objection, under a plain error analysis, there was no manifest injustice in the trial court's failure to *sua sponte* take curative measures.

(15) *Testimony of Illinois National
Guard Members*

Defendant argues that the trial court erred in admitting the testimony Robert Lewis and Steven Zegar, who served with Defendant in the Illinois National Guard. Lewis testified about the type of needle that Defendant preferred to use and Zegar testified about statements made by Defendant and about methods of concealing the site of an injection.

a.

■ Defendant objected to the testimony of Robert Lewis about the type of needle that Defendant preferred to use for drawing blood and the court sustained his objection. However, it allowed Lewis to testify that Defendant's preferred needle

for drawing blood in difficult cases was a butterfly needle. Another member of Defendant's National Guard unit, Sonya Oliver, testified that she preferred a butterfly needle for drawing blood from infants.

This was not evidence of a bad act. Rather, it showed Defendant's familiarity with a needle that could be used on infants and corroborated the testimony of Mother that Defendant was familiar with these needles and kept them in the lab coat that he brought with him when he infected the victim.

#### b.

■ Defendant also argues that the trial court erred when it allowed the prosecutor to elicit, without any objection, testimony from Steven Zegar that Defendant told him "that if someone would screw with him that he would inject them with something and they would never know what hit them." When the prosecutor asked Zegar what he understood by the term "inject," Defendant objected on the ground that the answer would be speculative. This objection was overruled, and Zegar said that he understood the word inject to mean injected to inflict harm.

The evidence in question was relevant to show the unusual manner in which Defendant intended to dispose of his adversaries. Namely, he would inject them with something harmful.

■ Zegar also testified about concealing the site of an injection. Zegar stated that an injection site could be concealed by giving an injection through a prior injection site or the site of an old intravenous line. Defendant objected and wanted a continuing objection on the ground that the testimony was speculative.

This was not character evidence or evidence of a prior bad act by Defendant. It was evidence demonstrating that Defendant could hide the injection of the victim.

Defendant did not challenge Zegar's qualifications to give this testimony, and it was relevant to show the jury that the crime could be concealed.

### III

■ Defendant next argues that the trial court erred in admitting Exhibit 39, a blood test result of B.S.J. taken in 1991. Defendant contends that there was no testimony that the blood samples tested were in the same condition when tested as when originally obtained, there was no evidence of the manner in which the blood sample was stored, no laboratory proof that this was the blood that was drawn from the victim or that the sample was in fact the victim's blood.

The record reflects that the victim was born on February 24, 1991. Shortly thereafter, he participated in an infant vaccination study at Cardinal Glennon Children's Hospital. As part of that study, blood was drawn from the victim in May, June and July of 1991. Preprinted labels were placed on each of the vials of the victim's blood. These labels listed the victim's name and other information about him.

After the victim was diagnosed as suffering from AIDS, Bill Huber of the Missouri Department of Health contacted the custodian of the blood samples and learned that they had been frozen. He asked for samples of the victim's blood for HIV testing. Huber picked up three samples, personally took them to Jefferson City, and handed them to the Director of the Serology Lab, Henry Strother, for shipment to the Center for Disease Control for testing. The Center's report, Exhibit 39, indicated that the tests for HIV were all negative.

The State offered Exhibit 39 into evidence and Defendant objected to the admission of the report. He stated that he had not stipulated to the admission of the Center reports and argued that the "lab person would have to testify."[5] The trial

---

**5.** Defendant was required to state a legally recognizable theory to preserve the matter for

appeal. *State v. Bell,* 743 S.W.2d 907, 909 (Mo.App. E.D.1988). A chain of custody

court overruled the objection and found that there had been "so much testimony that all of the results were negative" prior to the admission of the reports.

 A party cannot complain about the admission of evidence over his objection, where evidence of the same tenor is admitted without objection. *State v. Sloan*, 998 S.W.2d 142, 145 (Mo.App. E.D. 1999), citing *State v. Griffin*, 876 S.W.2d 43, 45 (Mo.App. E.D.1994). Further, a defendant suffers neither prejudice nor reversible error where evidence is improperly admitted if the evidence already properly before the court establishes essentially the same facts. *State v. Bucklew*, 973 S.W.2d 83, 93 (Mo. banc 1998); *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982). Therefore, no prejudice resulted from the admission of the exhibit because it was cumulative of other evidence. Point denied.

## IV

 In his fourth point Defendant alleges that the trial court erred in giving Jury Instruction Number Eight, which is MAI 312.10, more commonly known as the "hammer" instruction.[6]

The jury members were sequestered during the four-day trial and were staying at a hotel. They began their deliberations on a Saturday afternoon at 3:20 and sent a note to the court at 8:25 that evening advising that they had not yet been able to reach a unanimous decision. The court proposed to call the jury back into the courtroom and ask them if they would prefer to return the hotel and resume their deliberations on Monday morning. If a majority of the jurors wanted to continue deliberating at that time, the court would read Instruction Number Eight, which is MAI 312.10. Both the State and the Defendant agreed to this plan.

However, when the jurors voted to return to the hotel, the court called counsel to the bench and expressed his intention to read the hammer instruction and tell the jury that if they had not reached a verdict by 10:00 p.m. they could return to the hotel. Though defense counsel initially objected to the trial court's decision, they ultimately stated "That's fine."

 The fact that Defendant consented to the instruction affirmatively waived his objection. A statement by defense counsel affirmatively indicating that there is no objection precludes the Court from granting relief under plain error review on appeal. *See, State v. Scott*, 858 S.W.2d 282, 285 (Mo.App. W.D.1993).[7] Point denied.

## V

Defendant next argues that the trial court erred in denying his request for discovery of potentially exculpatory evidence including, but not limited to, a 1991

claim cannot be raised for the first time on appeal. *See State v. Blue*, 875 S.W.2d 632, 633–34 (Mo.App. E.D.1994). Defendant did not *specifically* raise a chain of custody claim, but we nevertheless grant review of this claim of error *ex gratia*.

6. MAI–CR 3d 312.10 reads as follows:
 You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

7. We note, however, that the decision whether to submit MAI–CR 3d 312.10 is within the sound discretion of the trial court. *State v. Mottley*, 953 S.W.2d 168, 170 (Mo.App. E.D. 1997). The defendant must prove jury coercion in order to establish that the trial court abused its discretion in its use of the hammer instruction. *Id.* Even if this issue was preserved for review in the case at bar, it is unlikely that Defendant could prove jury coercion.

blood sample of the victim; the names and addresses of people with HIV or AIDS at Barnes–Jewish Hospital in 1992; the Division of Family Services reports regarding possible abuse by the victim's mother; the psychological records of the victim's mother; the medical records of the victim's step siblings; the State's child support files of the victim's mother; and unrestricted use of the City of St. Louis Department of Health Report.

### (1) *Victim's 1991 Blood Sample*

■ Defendant requested a sample of the blood that was taken from the victim in 1991 pursuant to an immunization study. The trial court found that the State did not possess that sample and denied Defendant's discovery request. However, Defendant consented to the admission of the blood test results at trial.

■ Ordinarily, the defense should be afforded the opportunity to test samples. The State may be excused from providing a defendant with a sample, however, if there is no sample available and the State has not acted in bad faith. *See Boykin v. Leapley*, 28 F.3d 788, 792–793 (8th Cir.1994) (the state's failure to preserve evidence "did not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant.") (citations omitted). The State is not required to disclose evidence that it does not have. *State v. Bucklew*, 973 S.W.2d at 92.

In the case at bar, the trial court denied Defendant's discovery request after finding that the State did not possess the blood sample. In spite of the fact that he had not been afforded the opportunity to conduct separate testing, however, Defendant consented to the admission of the blood test results at trial. He cannot now show that manifest injustice resulted from the trial court's ruling.

### (2) *Names and Addresses of People with HIV or AIDS at Barnes– Jewish Hospital*

■ After Defendant filed a discovery request seeking the names and addresses of people with HIV or AIDS that were at Barnes–Jewish Hospital when the victim was infected, the State indicated that it did not possess the requested information.

■ The State is obligated to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *State v. Parker*, 886 S.W.2d 908, 916–917 (Mo. banc 1994), *cert. denied* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). The State has no obligation under the Due Process Clause to disclose information that it does not have. *United States v. Dierling*, 131 F.3d 722, 736 (8th Cir.1997). Nor does the State have the obligation to disclose evidence that it does not possess under Missouri's rules of discovery. *State v. Bucklew*, 973 S.W.2d at 92; *State v. Johnston*, 957 S.W.2d 734, 748 (Mo. banc 1997), *cert. denied* 522 U.S. 1150, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998); Rule 25.03; Rule 25.04.

Defendant does not dispute that the State did not possess the records of patients who tested positive for HIV at Barnes–Jewish Hospital. Nor has Defendant shown that the prosecutor could have gotten the evidence in question from the hospital and disclosed it to him.[8] There-

---

8. The medical records of patients who are HIV positive are confidential. Information pertaining to the HIV status of individuals is specifically protected by Section 191.656, RSMo 1994. Additionally, patients' medical records are privileged and only the patients can waive that privilege. *State v. Ermatinger*, 752 S.W.2d 344, 349–350 (Mo.App. E.D. 1988); Section 491.060(5), RSMo 1994. It is not likely that disclosure of this information could have properly been compelled. Though disclosure of privileged material may be compelled when adequate steps are taken to protect those on whose behalf the privilege is

fore, the trial court did not err in failing to compel the State to turn over these records to Defendant.

### (3) *DFS Reports Regarding Possible Abuse by the Victim's Mother*

██ Defendant argues that the trial court erred by refusing to order the State to provide him with alleged Division of Family Services reports regarding possible abuse by the victim's mother. Defendant contended that he received information from the State indicating that the children under Mother's care had suffered from injuries requiring medical attention. These injuries included burns, a head injury, and a broken bone, and the victim suffered from respiratory problems from birth. He alleged that these injuries could have resulted from neglect or abuse, that he believed that the Division of Family Services had investigated these matters, and that he wanted to see all reports that the Division may have generated. He did not, however, allege facts or offer evidence showing the basis for his belief that the Division conducted an investigation or that reports exist.

The trial court found that "the State does not have in its possession Division of Family Services reports regarding B.S.J. or any other minor children of Mother in its possession." Defendant did not argue or present evidence that records exist. The State was not required to produce records that did not exist. *See State v. Bucklew,* 973 S.W.2d at 92.

### (4) *Psychological Records of the Victim's Mother and Medical Records of the Victim's Siblings*

Defendant argues that the court should have ordered the prosecutor to disclose the psychological records of the victim's mother and the medical records of his siblings.

Neither set of records was in the State's possession. Therefore, the trial court did not err in failing to order the prosecutor to disclose the records. Moreover, the records were confidential and contained no exculpatory information.

#### a.

██ Though the court first denied the motion to compel discovery of Mother's psychological records, it later secured the records from Mother's physician and ordered an *in camera* inspection of the records "for the limited purpose of determining whether [Mother] made any statements regarding threats to her or her son by [Defendant], whether she suffered from any blackouts or hallucinations, whether she made any statements about harming another person, particularly the minor child B.S.J., and the reason for her hospitalization and exculpatory information that the [c]ourt deems relevant and material." After performing the *in camera* review, the trial court stated that it found "no reference to blackouts, hallucinations, or references to harming any other person including her minor child B.S.J., and no exculpatory information." Defendant did not challenge this ruling.

The trial court did not commit plain error or abuse its discretion by denying Defendant's motion because the State did not have the records in its possession and the records were confidential and protect-

---

asserted, Defendant did not attempt to employ any safeguards to protect the confidentiality of the individuals in question. *See St. Louis Little Rock Hospital, Inc. v. Gaertner,* 682 S.W.2d 146, 151 (Mo.App. E.D.1984). For example, Defendant never asked the trial court to conduct an *in camera* review of the records, though it is not likely that he could have justified such review. A defendant is not entitled to an *in camera* review of confidential

information on the "mere possibility" that it might be helpful. *State v. Clay,* 975 S.W.2d 121, 141 (Mo. banc 1998), *cert. denied* 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999). In the case at bar, Defendant did not allege any particular facts showing that the information would have been material or even showing what the trial court would have to look for if it conducted an *in camera* review of the material on its own motion.

ed by the physician-patient privilege. The trial court conducted an *in camera* review, the proper procedure for protecting confidentiality and Defendant's due process rights. *See State v. Newton*, 925 S.W.2d 468, 471 (Mo.App. E.D.1996). However, the trial court found no exculpatory information

#### b.

■ The trial court did not err in failing to order the prosecutor to disclose the medical records of the victim's siblings. Defendant's motion to compel did not allege facts, but stated conclusorily that the records were relevant to a determination if signs of Munchausen syndrome by proxy are present in those files.[9]

The medical records of the victim's siblings were in the custody of their respective physicians and were not in the State's possession. Moreover, they are confidential and protected by the physician-patient privilege. Defendant did not request that the records be reviewed by the trial court *in camera* to determine whether they contained any relevant information, and he cannot do so for the first time on appeal. *State v. Gray*, 926 S.W.2d 29, 33 (Mo.App. W.D.1996).

#### (5) *State Child Support Files Pertaining to the Victim's Mother*

In his Third Request for Discovery, Defendant requested the State's copy of the court file in the paternity case that Mother brought against Defendant. However, Defendant later withdrew his motion after it was disclosed to him that there was no exculpatory evidence in the files in question. Thus, the claim was waived.

#### (6) *Unrestricted Use of the St. Louis Health Department Report*

■ Defendant contends that he was not able to fully use a St. Louis Health

Department report that was disclosed to the defense, and that he should have been able to freely disseminate the information in the report to others. In Defendant's Motion to Release Department of Health Report, he asked for the trial court to authorize him to turn the reports over to Dr. Matt German and Dr. Daniel Gentry for their analysis. The court granted Defendant's motion.

On appeal, Defendant argues that he should also have been allowed to disseminate the report to other individuals. However, he did not ask the trial court for permission to disseminate the report more broadly. Trial courts are not to be convicted of error for reasons not presented to them. *State v. Gray*, 926 S.W.2d at 33. Further, Defendant has not shown that manifest injustice resulted from the trial court's actions. Point V is denied.

#### VI

■ In his penultimate point, Defendant argues that the trial court erred in permitting the State to pit his right to a speedy trial against his right to full and timely discovery of exculpatory evidence and in permitting the prosecuting attorneys to engage in misconduct that deprived Defendant of his right to a fair trial, due process, equal protection and a speedy trial.

Even under the most liberal reading of Rule 30.06(d), the point relied on is grossly insufficient for appellate review. *See State v. Ervin*, 979 S.W.2d 149, 162 (Mo. banc 1998). Defendant does not specify wherein and why the trial court erred, or point to rulings of the trial court that constituted error. Point denied.

#### VII

■ Finally, Defendant argues that the trial court erred in denying his motion

---

**9.** Munchausen syndrome by proxy is a psychological disorder in which a parent repeatedly seeks medical attention for a child after injuring the child with drugs, adding blood or bacterial contaminants to urine specimens, or taking other measures to simulate disease. *See*, THE MERCK MANUAL OF DIAGNOSIS AND THERAPY, VOL. II 743 (Robert Berkow, M.D., ed., 16th ed.1992).

for judgment of acquittal at the end of the State's evidence or, in the alternative, Defendant's motion for judgment of acquittal at the end of the evidence or, in the alternative, Defendant's motion for new trial. This point appears to challenge the sufficiency of the evidence.

 Defendant has abandoned these claims by failing to develop them in the argument portion of his brief and by failing to cite case law to support them. *State v. Khoshaba*, 878 S.W.2d 472, 475 (Mo.App. E.D.1994); *Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App. E.D.1996). However, we have *ex gratia* thoroughly reviewed the record in the case at bar to determine if the standards set forth in *State v. Grim*, 854 S.W.2d 403 (Mo. banc 1993), have been met. In reviewing a challenge to the sufficiency of the evidence, our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.* at 405. In the case at bar, sufficient evidence exists to support the judgment against Defendant. *Id.* Further discussion would serve no precedential or jurisprudential purpose. Point denied.

The judgment of the trial court is affirmed.

MARY RHODES RUSSELL, Chief Judge and WILLIAM H. CRANDALL, Jr., Judge concur.